Page 153

1  A. Yes.
2  Q. And is this your signature here?
3      THE WITNESS: Where is she saying
4  "here"?
5      MS. SNOW: Yeah, where are you -- oh,
6  right there.
7  A. Yes.
8  Q. (By Ms. Wang) And then would it be fair
9  that Brooke Thompson produced a statement that you
10  hadn't worked for two days?
11  A. That's right. I hadn't worked the previous
12  two days.
13  Q. I wanted to go back to the symptoms from
14  the verbal and physical assault and ask you what
15  were the emotional injuries that you received from
16  Mr. Reed's attack?
17  A. Stress, anxiety, the nightmares.
18  Q. Besides stress, anxiety and nightmares, did
19  you have any other symptoms from the verbal and
20  physical assault from Mr. Reed?
21  A. I'm sure I had hives.
22  Q. Besides stress, anxiety, nightmares and
23  hives, did you have any other symptoms from the
24  verbal and physical assaults from Mr. Reed?
25  A. Well, the bruising of my arms and my

Page 154

1  breasts.
2  Q. I just want to make sure we have a full
3  list. So besides the bruising, stress, anxiety,
4  nightmares and hives, did you have any other
5  symptoms from the verbal and physical assaults from
6  Mr. Reed?
7  A. No.
8  Q. When you mention hives, how often did you
9  have hives in December 2017?
10  A. I don't know how often.
11  Q. And would you say the hives that you
12  received as a result of these alleged physical and
13  verbal assaults, did they happen pretty close to
14  December 2017, or was it after?
15  A. It was both.
16  Q. And how late did you receive hives from the
17  verbal and physical assaults from Mr. Reed?
18  A. What do you mean "how late"?
19  Q. Well, in 20 -- in 2021, do you still have
20  hives?
21  A. If I wake up with a bad nightmare from
22  Mr. Reed, yes.
23  Q. And before 2017, did you have hives?
24  A. I'm sure I have.
25  Q. And how often do you get hives?

Page 155

1  A. They're stress-related.
2  Q. So there are other stress reasons why you
3  receive hives, correct?
4  A. Yes. I wanted to talk a little bit about
5  the bruising.
6  Q. Did you have any lasting effects from the
7  bruising?
8  A. No.
9      MS. WANG: Thank you so much. Zach,
10  did you have any questions? Oh, great.
11      MR. BUCHHEIT: Yes, I have some
12  questions. But, first, I just wanted to ask you if
13  you need a break right now. (Inaudible.)
14      THE REPORTER: I'm sorry, I can't hear
15  you very well. Is this Mr. Buchheit?
16      MR. BUCHHEIT: Yes, ma'am.
17      THE REPORTER: Okay.
18      MR. BUCHHEIT: I'll just come closer
19  to the -- I'll come right here. Let me just test
20  this out.
21      THE REPORTER: I'm hearing you fine
22  now. Yeah.
23      MR. BUCHHEIT: Well, I think -- let me
24  check. Okay. How is this?
25      THE REPORTER: It sounds good.

Page 156

1      MR. BUCHHEIT: That's better?
2      THE REPORTER: Uh-huh.
3      MR. BUCHHEIT: I'll try to be loud and
4  clear.
5      THE REPORTER: Okay.
6      EXAMINATION
7  BY MR. BUCHHEIT:
8  Q. I wanted to just define a few terms just
9  because I think I'm going to use them a couple of
10  times, just so we're clear and kind of -- we have
11  the same understanding of what we mean.
12  A. Okay.
13  Q. So if I say "communicate," I mean in-person
14  conversations, any form of communication over the
15  phone or by e-mail or -- or any form of otherwise
16  communication. Does that make sense?
17  A. Yes.
18  Q. And when I say "sexual misconduct," I'd
19  like to just use that to refer to both physical and
20  verbal allegations of sexual abuse. Is that okay?
21  A. (Witness nods head.)
22  Q. Okay. And then "allegations," I just mean
23  what you said in your lawsuit. Does that make
24  sense?
25  A. Uh-huh.

39 (Pages 153 to 156)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 5:19-cv-06022-BP   Document 93-4   Filed 08/13/21   Page 1 of 6

## Page 157

1  Q. Okay. So, first, I just want to ask you
2  about a few people, if you know them. The first one
3  is Vebia Sturm. Do you know that name?
4  A. No.
5  Q. You've never heard of that name?
6  A. No.
7  Q. Matt Briesacher?
8  A. No.
9  Q. Anne Precythe?
10  A. I have now.
11  Q. Have you ever heard Anne Precythe's name
12  before today?
13  A. In the lawsuit.
14  Q. George Lombardi?
15  A. He used to be something with the prison.
16  Q. Okay.
17  A. I mean, I've heard it before, but I'm not
18  sure what he does.
19  Q. Well, I represent Anne Precythe, and she's
20  the director of the Missouri Department of
21  Corrections. Do you have an understanding of what
22  the director does?
23  A. No.
24  Q. So I take it you've never talked to
25  Ms. Precythe?

## Page 158

1  A. No.
2  Q. Do you know if any of the people we've
3  talked about today have ever talked to Anne Precythe
4  or communicated with Anne Precythe?
5  A. No.
6  Q. Or anyone in her office?
7  A. Not that I know of, no.
8  Q. Or Matt Briesacher? Or Vebia Sturm?
9      THE REPORTER: I'm sorry, I'm not
10  getting the answers.
11  A. No.
12      MR. BUCHHEIT: Do you need me to
13  repeat any of those questions? I'm asking the court
14  reporter.
15      THE REPORTER: I got head shakes.
16  Q. (By Mr. Buchheit) Can you just confirm
17  that your answer was "no" to -- to those questions?
18  A. No. That was no to those questions.
19  Q. Okay. So -- I'm sorry to repeat myself,
20  but just --
21  A. That's all right, sir.
22  Q. Just to confirm, of all the people we've
23  talked about today, are you aware of -- of them
24  having any communications with Vebia Sturm?
25  A. No.

## Page 159

1  Q. Or any communications with Matt Briesacher?
2  A. No.
3  Q. Or any communications with Anne Precythe?
4  A. No.
5  Q. Or any communications with anyone in their
6  offices?
7  A. No.
8  Q. Okay. That helps. Are you aware of Anne
9  Precythe being involved in any way with these
10  allegations -- your allegations in this lawsuit?
11      MS. SNOW: I'm going to just object as
12  to vague. Obviously, go ahead and answer. But I
13  don't even know if you know how to answer that.
14      MR. BUCHHEIT: Let me ask a better
15  question.
16  Q. (By Mr. Buchheit) Do you know about
17  investigations into your lawsuit or any of the
18  claims of your lawsuit?
19  A. Do I know about them? Yes.
20  Q. What do you know about those
21  investigations?
22  A. I know that they're going on, you know. I
23  mean...
24  Q. Do you know if any of them are concluded?
25  A. No.

## Page 160

1  Q. Do you -- do you know if Anne Precythe had
2  any involvement in those investigations?
3  A. I have no idea.
4  Q. Or Matt Briesacher?
5  A. No.
6  Q. Are you aware of any inmates at Chillicothe
7  Correctional Center during the time that you were
8  there that had conversations with Anne Precythe?
9  A. No.
10  Q. Or Matt Briesacher?
11  A. No.
12  Q. Or Vebia Strum?
13  A. No.
14  Q. Are you aware of any staff at Chillicothe
15  Correctional Center while you were there that had
16  conversations with Anne Precythe?
17  A. No.
18  Q. Or Matt Briesacher?
19  A. No.
20  Q. Or Vebia Strum?
21  A. No.
22  Q. And just to be clear, are you aware of
23  anyone at all that has ever had communications with
24  Matt Briesacher?
25  A. No.

40 (Pages 157 to 160)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 5:19-cv-06022-BP   Document 93-4   Filed 08/13/21   Page 2 of 6

Page 161

1  Q. Or Vebia Strum?
2  A. No.
3  Q. Or Anne Precythe?
4  A. No.
5  Q. That will kind of speed things up. We
6  talked a little bit earlier about when you reported
7  your allegations. Do you remember that?
8  A. Yes.
9  Q. I don't want to drag you through all of
10 that again, but I just wanted to be sure: You're
11 also claiming there's retaliation involved?
12 A. Yes.
13 Q. And did you report the retaliation, too?
14 A. No.
15 Q. Okay. For any of the defendants?
16 A. No.
17 Q. Okay. Are you aware of any news reports
18 about your allegations?
19 A. There was a paper here, the Kansas City
20 Star.
21 Q. What do you know about that?
22 A. I seen it.
23 Q. What -- what do you recall about it?
24 A. It just said Chillicothe inmate against
25 correctional officers.

Page 162

1  Q. Do you recall anything else about that news
2  report?
3  A. It wasn't my paper so...
4  Q. How did you get it?
5  A. I was over reading somebody's -- they were
6  talking about it and they didn't know it was me.
7  Q. Do you know who that person was?
8  A. No, I don't remember what her name was.
9  Q. Where did that happen?
10 A. On the house.
11 Q. Which house?
12 A. The 3 House.
13 Q. At Chillicothe?
14 A. No. Here.
15 Q. At Vandalia?
16 A. Yeah.
17 Q. Do you remember when you saw that news
18 article?
19 A. It's been a while back.
20 Q. Do you remember what allegations
21 were -- strike that. I don't need to ask you that.
22 Would you say that the allegations that you're
23 making in your lawsuit were widespread at
24 Chillicothe?
25       MS. SNOW: I'm going to just object as

Page 163

1  to vague. But you can answer if you understand what
2  he's asking.
3  Q. (By Mr. Buchheit) Do you understand what
4  I'm asking?
5  A. Not really.
6  Q. Well, I'll just -- your -- your lawsuit
7  alleges that the allegations that you're making were
8  widespread at Chillicothe. So I'm asking you, would
9  you say that the allegations were widespread?
10 A. You mean do people in Chillicothe know now?
11 Q. Well, I'm asking if your allegations that
12 you're making in your lawsuit, if those things
13 happened to other people, too, at Chillicothe?
14 A. I'm not sure exactly what happened to
15 anybody else but myself.
16 Q. Okay.
17 A. There were people that said things, but I
18 can't honestly tell you for sure that it happened to
19 them or not.
20 Q. You don't remember who those people were?
21 A. It just got talked about on the yard and
22 whatnot.
23 Q. And was that about any particular officer?
24 A. More Mosier and -- well, Mustain, Mosier
25 and Bearden.

Page 164

1  Q. And Reed, too?
2  A. He was later on.
3  Q. How often would you say you had those kind
4  of conversations?
5  A. They'd just talk about it. Early on when
6  there was a question of pat-downs, people would say
7  Bearden was over-friendly.
8  Q. So just in general?
9  A. Yes.
10 Q. Are you aware of that kind of general
11 conversation about the allegations at other
12 facilities in Missouri?
13 A. No.
14 Q. Here at Vandalia?
15 A. No.
16 Q. How are things here at Vandalia compared to
17 Chillicothe?
18 A. Well, there's a difference. I mean,
19 because you can't go outside here. The food is
20 better in Chillicothe. The -- you get more food
21 visits there. I was getting private visits there
22 with my son. They have patch there. I mean, the
23 sporting is better.
24 Q. Would you say there's -- you're subject to
25 sexual misconduct here at Vandalia?

41 (Pages 161 to 164)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 5:19-cv-06022-BP   Document 93-4   Filed 08/13/21   Page 3 of 6

## Page 165

1  A. There is -- I mean, I'm sure. I'm sure.
2  Q. Well, has it happened to you?
3  A. No.
4  Q. Do you have the same level of fear of
5  sexual misconduct here as you did at Chillicothe?
6  A. I don't have the same level of fear, no.
7  Q. Are you aware of any DOC policies relating
8  to sexual misconduct?
9  A. No.
10 Q. Are you aware of any policies that mandate
11 that the Director of the Department of Corrections
12 takes -- takes action related to sexual misconduct?
13 A. No.
14 Q. Are you aware of any policies in the
15 department?
16 A. Like what kind of policies?
17 Q. Anything to do with --
18 A. I don't know what the staff policies are,
19 no.
20 Q. Okay. Anything to do with staff policies
21 as to how staff treat inmates?
22 A. I feel they should be fair and just.
23 Q. Do you know how long Edward Bearden
24 remained at Chillicothe?
25 A. He was there -- a few months before I left,

## Page 166

1  he left.
2  Q. A few months before you left, he left. Do
3  you know about when that was?
4  A. No.
5  Q. When did you leave Chillicothe?
6  A. October of '18.
7  Q. Do you know who decided he would remain at
8  Chillicothe?
9  A. No.
10 Q. Would you say -- I'm sorry. Strike that.
11 Do you have any reason to believe that Anne Precythe
12 knew about your allegations or knows about your
13 allegations?
14 A. She knows now.
15 Q. How?
16 A. Probably the newspaper. And she's named in
17 the lawsuit.
18 Q. Would she know for any other reason that
19 you can think of?
20 A. No.
21 Q. Do you have any reason to believe anyone
22 else in her office, the director's office, knows
23 about your allegations?
24 A. No.
25 Q. Do you have any reason to believe Matt

## Page 167

1  Briesacher knows about your allegations?
2  A. No.
3  Q. Or Vebia Strum?
4  A. No.
5  Q. Can you think of anyone else outside of the
6  people we've talked to today who knows about your
7  allegations?
8  A. No.
9  Q. Can you think of anyone who might have
10 reported your allegations to Anne Precythe?
11 A. No.
12 Q. Or Matt Briesacher?
13 A. No.
14 Q. Or Vebia Sturm?
15 A. No.
16 Q. Do you know who John Dunn is?
17 A. Yes.
18 Q. Who's John Dunn?
19 A. He was a psychiatrist from Chillicothe.
20 Q. Did you have much interaction with John
21 Dunn?
22 A. On the walk.
23 Q. On the walk?
24 A. Yeah.
25 Q. What does that mean?

## Page 168

1  A. He would walk on the walk in front of the
2  housing units all the time. Or if you go into
3  mental health, he would be there.
4  Q. Did he ever talk to you?
5  A. Briefly he talked to me.
6  Q. And what would he talk about with you?
7  A. He was weird.
8  Q. What do you mean he was "weird"?
9  A. Just kind of -- he was just kind of an odd,
10 weird guy.
11 Q. Did he talk to you the way Mr. Reed or
12 Mr. Mosier or Mr. Mustain or Mr. Bearden talked to
13 you?
14 A. No.
15 Q. Did he ever touch you inappropriately?
16 A. No.
17 Q. Now, your complaint says that Anne Precythe
18 was specifically aware of the allegations against
19 all the other defendants in this case. Do you think
20 that's true?
21     MS. SNOW: I'm going to object to the
22 extent that it calls for attorney-client privilege.
23 But subject to that, you can answer.
24 Q. (By Mr. Buchheit) Let me ask you a
25 different -- a different way. Do you have any

42 (Pages 165 to 168)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 5:19-cv-06022-BP   Document 93-4   Filed 08/13/21   Page 4 of 6

**Page 169**

1 reason to believe that Anna Precythe was
2 specifically aware of your allegations against the
3 other defendants in this case?
4     A. One more time.
5     Q. Oh, I'm sorry. That's okay. Do you have
6 any reason to believe that Anne Precythe was
7 specifically aware of any of your allegations
8 against the other defendants in this lawsuit?
9     A. Probably.
10     Q. What do you mean "probably"?
11     A. Well, it was in the paper so...
12     Q. Do you have any reason to believe she would
13 be aware for another reason?
14     A. If any lawsuits or anything like that would
15 be filed, yes.
16     Q. Any other reason besides the lawsuit or the
17 paper?
18     A. No.
19     Q. Now, aside from your testimony here today
20 and testimony -- you know, your answers to
21 interrogatories and your report to Leslie Carsey,
22 can you think of any other evidence that would
23 support your claims against the defendants in this
24 lawsuit?
25     A. Just the people.

**Page 170**

1     Q. The people who know?
2     A. Yeah. People -- just maybe what was going
3 on in Chillicothe.
4     Q. Are any of those people people that we
5 haven't talked about today?
6     A. There's numerous names on that lawsuit.
7     Q. Can you think of anyone else that we
8 haven't talked about today that would know about
9 your allegations?
10     A. Not right offhand, no.
11     Q. I mean, it was in the paper so...
12     A. Right.
13     Q. Do you know if Anne Precythe has ever
14 talked with Edward Bearden or ever communicated with
15 Edward Bearden?
16     A. I have no idea.
17     Q. Do you know if she's ever communicated with
18 any of the other defendants in this case?
19     A. I don't know.
20     Q. Okay. Do you feel like you're still at
21 risk of harm?
22     A. Yes.
23     Q. In what ways?
24     A. Well, because Chillicothe comes here, and
25 the officers that talk, you know. So I'm afraid

**Page 171**

1 there might be retaliation here.
2     Q. Do you feel like you're at risk of harm
3 from anyone in the director's office?
4     A. No.
5     Q. Anyone in the Office of Professional
6 Standards?
7         MS. SNOW: Do you even know who that
8 is?
9     A. No. I wouldn't know.
10     Q. (By Mr. Buchheit) Okay. Okay. I want to
11 talk to you a little bit about cameras at
12 Chillicothe.
13     A. Okay.
14     Q. You're aware there's cameras at
15 Chillicothe?
16     A. Yes.
17     Q. And you can see them?
18     A. Yes.
19     Q. Okay. Are there blind spots?
20     A. Yes.
21     Q. Do you know what I mean when I say "blind
22 spots"?
23     A. Yes.
24     Q. What's your understanding of that?
25     A. Blind spots where they can't be seen.

**Page 172**

1     Q. Where what?
2     A. Where the camera can't see.
3     Q. Did any of the allegations of sexual
4 misconduct happen in areas where cameras could see
5 them?
6     A. No. They were at the blind spots.
7     Q. And you're sure about that?
8     A. Yes, I'm sure.
9     Q. And all of your allegations of sexual
10 misconduct, did those ever occur in front of other
11 staff who were not committing the sexual misconduct?
12     A. No.
13     Q. Always outside of the view of staff?
14     A. Yes.
15     Q. Are you -- and -- and you know that for
16 certain?
17     A. I can't say for certain, no.
18     Q. Okay. But as far as you know?
19     A. Yes.
20     Q. Okay. Do you have any reason to believe
21 that Anne Precythe has acted maliciously against
22 you?
23     A. No.
24     Q. And you know what I mean when I say
25 "maliciously"?

43 (Pages 169 to 172)

ALARIS LITIGATION SERVICES
www.alaris.us     Phone: 1.800.280.3376     Fax: 314.644.1334
Case 5:19-cv-06022-BP    Document 93-4    Filed 08/13/21    Page 5 of 6

## Page 173

1  A. Just basically against me.
2  MR. BUCHHEIT: Okay. I think that's
3  all I have. Do you mind if I just take one quick
4  look at my notes?
5  THE WITNESS: Go ahead.
6  MR. BUCHHEIT: I think that's it,
7  though.
8  MS. WANG: I have a few follow-up
9  questions, Zach, if that would give you more time.
10  Either way is fine with me.
11  MR. BUCHHEIT: Yeah. If you don't
12  mind just waiting, I -- I think I can look through
13  my notes real quickly here.
14  MS. WANG: No worries.
15  MS. SNOW: And just so all of you
16  know, I'll -- I'll have some questions as well.
17  And, obviously, I'll give you all a chance to ask
18  additional questions after I am finished.
19  MS. WANG: Sounds good.
20  Q. (By Mr. Buchheit) So it's fair to say
21  that, as far as you know, Anne Precythe has no
22  involvement in the investigations related to your
23  case?
24  MS. SNOW: I'm going to object. I
25  think that misstates her testimony. I'm also going

## Page 174

1  to object on the ground of attorney-client
2  privilege. Subject to all of that, you can answer.
3  MR. BUCHHEIT: Let me try to ask it a
4  different way.
5  Q. (By Mr. Buchheit) Are you aware of Anne
6  Precythe having any involvement in your allegations?
7  A. No.
8  MR. BUCHHEIT: I don't have anything
9  else right now, but I might have some follow-up
10  questions after Jen goes.
11  MS. SNOW: Christal, do you want to go
12  now or just after I go?
13  MS. WANG: It doesn't matter. It
14  could be either way.
15  MS. SNOW: Go ahead.
16  MS. WANG: Okay.
17  EXAMINATION
18  BY MS. WANG:
19  Q. Ms. Dean, in your opinion, where are the
20  blind spots in the kitchen?
21  A. Behind closed doors and where the mops and
22  the brooms are. There's several other -- several
23  other spots in the kitchen.
24  Q. When you said "behind closed doors," are
25  you only referencing the chemical closet, or is

## Page 175

1  there another spot that's behind closed doors?
2  A. I don't think there's -- I don't -- in the
3  officers' area or whatever, I don't think there's a
4  camera there.
5  Q. What do you mean by "officer area"?
6  A. In the bubble.
7  Q. In the kitchen, is there a desk or table
8  that is a blind spot?
9  A. I'm not sure what the bubble can see.
10  Q. Okay. I was just curious that --
11  A. Or the staff.
12  Q. Go ahead.
13  A. The staff break room, I don't know what the
14  camera sees in there either.
15  Q. Were you alone with Mr. Reed in the staff
16  break room?
17  A. I have been before, yes.
18  Q. How many times?
19  A. I don't know.
20  Q. Besides the kitchen, the chemical closet,
21  the barbershop and the office staff room, are there
22  any other locations that you have been alone with
23  Mr. Reed?
24  A. No.
25  Q. When you mentioned the desk that Mr. Reed

## Page 176

1  had referenced to you, where is that desk?
2  A. In the staff break room.
3  Q. And I just want to clarify because
4  Dr. Piasecki mentioned a table. Did Mr. Reed
5  verbally assault you in regards to a desk or a
6  table, or both?
7  A. Both.
8  Q. So is it possible that there is a camera in
9  the staff break room but you're not sure?
10  A. There could be.
11  Q. In terms of the table in the kitchen, is
12  that a blind spot?
13  A. There are several areas of -- there are
14  several tables in the kitchen and there are several
15  areas that do not -- the cameras don't see.
16  Q. How many tables do the cameras not see?
17  A. I don't know.
18  Q. When Mr. Reed called you in the kitchen so
19  he could rub himself inappropriately over your body
20  allegedly, did this happen on the table or somewhere
21  else?
22  A. Can you rephrase -- can you tell me that
23  again?
24  Q. In your petition, it says, Reed routinely
25  called plaintiff into the kitchen solely so he could

44 (Pages 173 to 176)

ALARIS LITIGATION SERVICES
www.alaris.us    Phone: 1.800.280.3376    Fax: 314.644.1334
Case 5:19-cv-06022-BP   Document 93-4   Filed 08/13/21   Page 6 of 6