# EXHIBIT

# 13

## Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF MISSOURI
 2
    KAREN BACKUES KEIL,        )
 3                             )
            Plaintiff,         )
 4                             )
       V.                      ) Case No.
 5                             ) 5:18-CV-06074-BP
                               )
 6  MHM SERVICES, INC., a      )
    Virginia Corporation,      )
 7  JOHN DUNN, and EDWARD BEARDEN, )
                               )
 8          Defendants.        )
 9
10         IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF MISSOURI
11
    LYNNSEY BETZ,              )
12                             )
            Plaintiff,         )
13                             )
       V.                      ) Case No.
14                             ) 5:18-CV-06079-FJG
                               )
15  EDWARD BEARDEN, et al.,    )
                               )
16          Defendants.        )
17
18         IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF MISSOURI
19
    ASHLEY ZIESER,             )
20                             )
            Plaintiff,         )
21                             )
       V.                      ) Case No.
22                             ) 5:18-CV-06103-FJG
                               )
23  EDWARD BEARDEN, et al.,    )
                               )
24          Defendants.        )
25
```

## Page 2

```
 1         IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF MISSOURI
 2
    TERI DEAN,                 )
 3                             )
            Plaintiff,         )
 4                             )
       V.                      ) Case No.
 5                             ) 5:18-CV-06022-SRB
                               )
 6  EDWARD BEARDEN, et al.,    )
                               )
 7          Defendants.        )
 8
           IN THE UNITED STATES DISTRICT COURT
 9          FOR THE WESTERN DISTRICT OF MISSOURI
10  JANE DOE,                  )
                               )
11          Plaintiff,         )
                               )
12     V.                      ) Case No.
                               ) 19-cv-6161BP
13                             )
    EDWARD BEARDEN,            )
14    In his Individual Capacity,)
                               )
15          Defendant.         )
16
            DEPOSITION OF VEVIA STURM
17          Taken on behalf of Plaintiffs
18
            The deposition of VEVIA STURM, a witness
19  called at the instance of the Plaintiffs, for
    purposes of DISCOVERY taken on March 16, at 9:00
20  a.m., via Zoom, before Erikia Schuster, Illinois
    Certified Shorthand Reporter No. 084-004660,
21  pursuant to notice.
22
23
24
25
```

## Page 3

```
 1              INDEX OF EXAMINATION
 2
 3  Page
    Questions by Mr. Ammann.................. 6
 4  Questions by Mr. Buchheit................123
 5
 6              INDEX OF EXHIBITS
 7  DEPOSITION EXHIBITS
 8  Exhibit No. 1          PAGE 86
    Exhibit No. 4          PAGE 71
 9  Exhibit No. 5          PAGE 87
    Exhibit No. 6          PAGE 90
10  Exhibit No. 9          PAGE 93
    Exhibit No. 10         PAGE 94
11  Exhibit No. 11         PAGE 96
    Exhibit No. 15         PAGE 98
12  Exhibit No. 19         PAGE 103
    Exhibit No. 34         PAGE 110
13  Exhibit No. 36         PAGE 61
    Exhibit No. 46         PAGE 116
14
15
16
17
18
19
20
21
22
23
24  (Exhibits retained by counsel.)
25
```

## Page 4

```
 1              APPEARANCES
 2
 3  JOHN J. AMMANN
    BRENDAN ROEDIGER
 4  Saint Louis University Legal Clinic
    100 North Tucker, Suite 704
 5  St. Louis, MO 63101
    314-977-2778
 6
         On Behalf of the Plaintiffs,
 7
 8
 9
10  NICOLAS TAULBEE
    Office of the Attorney General
11  615 East 13th Street
    Suite 401
12  Kansas City, MO 64106
    816-889-5000
13
    ZACHARY BUCHHEIT
14  CHRISTAL WANG
    Office of the Attorney General
15  207 West High Street
    Jefferson City, MO 65101
16  573-751-3321
17
         On Behalf of the Defendants.
18
19
20
21
22
23
24
25
```

Page 9

1  rules of deposition, but let's do a quick
2  reminder. If at any point you need a break, let
3  me know, okay?
4      A. Okay.
5      Q. If I ask you a question and you don't
6  understand, you'll let me know that you don't
7  understand; can you agree with that?
8      A. I will.
9      Q. If you answer a question, I'll assume
10 that you understood the question.
11     A. Correct.
12     Q. Is my volume okay? Can you hear me
13 all right?
14     A. I probably need to turn mine up, but
15 I'm not sure how to do that. I think I'm okay.
16 I'm going to have to be.
17     Q. The rest of you like Nick, the volume
18 is okay? All right.
19         Okay. Prior to this deposition, I
20 don't want to know what conversations you had
21 with your lawyers, but did you talk to anybody
22 else other than your lawyers to prepare for
23 today?
24     A. No.
25     Q. Did you review any documents either

Page 10

1  electronically or physically to prepare for
2  today?
3      A. I reviewed the case on Dunn.
4      Q. Okay. Did you review any other cases
5  or any other investigations?
6      A. No, I did not.
7      Q. We're going to talk to you about just
8  some general background. This will be very
9  quick, but things I need to ask you. What is
10 your highest level of education that you
11 received?
12     A. A bachelor's degree.
13     Q. And in what subject or what major?
14     A. Psychology.
15     Q. Do you have any postgraduate work at
16 all.
17     A. No.
18     Q. And where did you get your degree
19 from?
20     A. Lincoln University.
21     Q. That's in Jefferson City?
22     A. It is.
23     Q. And in what year was that?
24     A. 1993.
25     Q. Where are you currently employed?

Page 11

1      A. Department of Corrections.
2      Q. What is your title?
3      A. PREA manager.
4      Q. How long have you held that post?
5      A. I've been the PREA coordinator since
6  January 1st, 2011. On June 1st, 2017, the
7  investigators moved under me, the PREA special
8  investigators moved under me, and I became the
9  PREA manager over the investigations and
10 compliance.
11     Q. You're going to have to help me here.
12 So what is the difference between PREA -- and
13 let's define some terms. When you say PREA, what
14 do you mean?
15     A. Prison Rape Elimination Act.
16     Q. Thank you. Tell me the difference
17 between what you did as PREA manager with what
18 you did as PREA coordinator.
19     A. As PREA coordinator, I implemented
20 the PREA standards which are federal regulations
21 within the Department of Corrections within our
22 facilities. I oversaw compliance issues, audits
23 to make sure we stayed in compliance with PREA
24 standards. As PREA manager, I still have the
25 compliance piece, I also oversee and supervise

Page 12

1  the investigators for Office of Professional
2  Standards.
3      Q. And remind me what year did that
4  happen where you became PREA manager?
5      A. June 1st, 2017.
6      Q. Am I right in saying that the jobs of
7  PREA coordinator are still your job that was
8  consumed in your new title; is that right?
9      A. Still my job, yes. I do both.
10     Q. When did you first start working at
11 the Missouri Department of Corrections?
12     A. I started in December 1st, 1998.
13 Worked here for two years in a prison setting,
14 left, went to Department of Mental Health for
15 five years and came back in 2005, January, I
16 think.
17     Q. And the first time you were at DOC,
18 what position did you have?
19     A. I was a case manager.
20     Q. And when you came back the second
21 time, how did you come in? What position?
22     A. Reentry coordinator.
23     Q. Have you ever been a corrections
24 officer?
25     A. I have not.

Page 29

1  A. Yes.
2  Q. And tell me about that? Where do you
3  go to give training and what does it look like?
4  A. I train all what we call -- the
5  deputy wardens that are the site coordinators, I
6  do those trainings, until COVID, a couple of
7  times a year. We have one coming up in May. All
8  the deputy wardens that are involved in PREA
9  comes in and we start from beginning and go
10 through how to do your job as a PREA coordinator.
11     I've been involved in training
12 investigators. When PREA first started, we
13 developed training and trained all of the
14 investigators.
15 Q. And do you personally give the class
16 and do the training?
17 A. Which time?
18 Q. Any of them?
19 A. Yes. Whenever I do the deputy
20 wardens, yes, for sure. And whenever I was
21 involved in the first and second training, I was
22 part of the team that presented, yes.
23 Q. You said it kind of quickly. I think
24 you said deputy warden PREA coordinator?
25 A. Yes.

Page 30

1  Q. Is that one person or is that two
2  people?
3  A. I'm sorry. Each prison has two
4  deputy wardens and one of the deputy wardens has
5  been selected as the site coordinator, and so
6  he's the deputy warden/PREA coordinator and he
7  coordinates the activities in his facility to
8  ensure compliance.
9  Q. But he or she would be the PREA site
10 coordinator?
11 A. Yes.
12 Q. Have you ever written any articles or
13 papers about PREA?
14 A. No.
15 Q. Have you developed yourself any of
16 the training materials, PowerPoint, slides or
17 handouts or that sort of thing?
18 A. Yes.
19 Q. Ms. Sturm, who is your direct
20 supervisor? Who do you report to?
21 A. Matt Briesacher.
22 Q. And Mr. Briesacher, we've heard his
23 name a lot. What is his title?
24 A. He is the director of OPS, Office of
25 Professional Standards, and also our legal

Page 31

1  counsel, one of them.
2  Q. And who does he report to?
3  A. Our director, Director Precythe.
4  Q. Is there any part in the flowchart,
5  any duties, responsibilities where you report
6  directly to the director?
7  A. No.
8  Q. How often do you have contact with
9  Director Precythe would you say?
10 A. Periodically. I have a meeting this
11 afternoon with her. We have other initiatives
12 going on where I'm in meetings with her, but not
13 often. A few times a year whenever need be.
14 Q. Is your meeting today about these
15 cases?
16 A. It is not. It is about the audits.
17 Q. Okay. I had to case. I'm just doing
18 my job. So let's break that down a little bit
19 more. In any given month, how often would you
20 say you have an in-person meeting with Director
21 Precythe or you're present in a meeting where
22 she's present?
23 A. I would say once every three months
24 maybe.
25 Q. That you're in a meeting where she's

Page 32

1  present?
2  A. Yes.
3  Q. Are there any times where it's just
4  the two of you?
5  A. Today it will only be just the two of
6  us, but very seldomly. Normally it's a group
7  meeting.
8  Q. How often would you say you have
9  e-mail communications where Director Precythe is
10 on an e-mail either copied or she's the recipient
11 or she's sending e-mail to you?
12 A. Not often. I don't know the answer
13 to that.
14 Q. Are you aware of any e-mails that you
15 and Ms. Precythe have both been on regarding any
16 of these cases?
17 A. No.
18 Q. Have you had any conversations with
19 Ms. Precythe about any of these cases?
20 A. No.
21 Q. Can you tell me why that is?
22 A. Because I report to Matt Briesacher.
23 Q. Do you know if she's had any
24 conversations with Ms. Precythe about these
25 cases?

## Page 33

1    A. I do not.
2    Q. What conversations have you had with
3 Mr. Briesacher about these cases?
4    A. Not much. This was in 2017. That's
5 quite a long time ago. The only conversation,
6 the most recent I can recall is whenever we
7 administratively closed some cases because the
8 FBI was involved in them.
9    Q. We're going to talk about that.
10   A. Okay.
11   Q. I'm going to ask you about lawsuits.
12 If a female offender files a PREA lawsuit
13 alleging sexual abuse, sexual assault against a
14 corrections officer in Missouri, do you get told
15 about that, or does that information get to you
16 when there's a lawsuit?
17   A. Normally not, no. Only if I'm going
18 to be deposed.
19   Q. So if a corrections officer is sued
20 by a female offender and we know it goes to the
21 Attorney General's office from the legal side,
22 but who within DOC gets told about the lawsuit as
23 you know?
24   A. Matt Briesacher.
25   Q. Is there anybody else?

## Page 34

1    A. I have no idea.
2    Q. Do you know if the director gets told
3 about lawsuits?
4    A. I have no idea.
5    Q. What if there's multiple lawsuits
6 against a corrections officer? Do more people
7 get involved if there are multiple lawsuits?
8    A. I have no idea.
9    Q. At some point you became aware that
10 Mr. Bearden, a corrections officer, was being
11 sued; is that right?
12   A. Yes.
13   Q. We'll come back to that in a minute.
14      Ms. Sturm, I want to clear up some of
15 the early basics and then we'll move on. In your
16 position as PREA manager now, do you travel to
17 the various prisons or do you stay in Jeff City?
18   A. I travel.
19   Q. How often have you in the last year,
20 would you say, that you've been in the women's
21 prisons?
22   A. I have not this last year.
23   Q. And I know with the virus it's not
24 the safest thing to do. Before the virus, how
25 often would you have gone to the women's prisons?

## Page 35

1    A. Based on what is needed. Whenever it
2 is an audit year, I go for a mock audit. I go
3 back for the audit. I'm onsite during all of
4 that. If we have issues going on in the prisons,
5 I could go and meet with staff to train them.
6    Q. Okay. We're going to talk about the
7 investigators whom you supervise. Other than the
8 investigators, do you supervise anybody else?
9    A. I have a clerical staff member, my
10 administrative assistant, and I have my
11 assistant -- my assistant PREA manager, but he's
12 also an investigator and he helps supervise the
13 investigators.
14   Q. And who is that?
15   A. Darren Snellen.
16   Q. I'm going to read you some names and
17 I want you to briefly describe your relationship
18 to them within DOC and how you work together.
19   A. Okay.
20   Q. And I believe he's no longer there,
21 but an investigator named Shreve Bentley?
22   A. Yes, he worked for me.
23   Q. And is it true that he is no longer
24 at DOC?
25   A. It is true.

## Page 36

1    Q. Do you know why he left?
2    A. He got a really good job with the
3 National Guard.
4    Q. Okay. All right. And so you
5 supervised Mr. Bentley; is that right?
6    A. I did, yes.
7    Q. Would you have been his supervisor
8 when he investigated John Dunn?
9    A. Yes.
10   Q. Would you have been his supervisor
11 when he investigated Mr. Bearden with Karen
12 Backues' allegations?
13   A. Yes.
14   Q. Did you supervise Mr. Bentley when he
15 investigated anything else about Mr. Bearden?
16   A. That's vague. I don't know.
17   Q. Okay.
18   A. There could have been investigations
19 before I was ever in this position. I have no
20 idea.
21   Q. I understand that. Do you remember
22 supervising Mr. Bentley when he investigated any
23 of the women we've mentioned already as
24 plaintiffs in these lawsuits?
25   A. I can't recall.

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

## Page 89

1  City Star article about Lynnsey Betz' lawsuit?
2  A. I don't recall.
3  Q. And is a newspaper story about a
4  lawsuit a reason that you would start an
5  investigation?
6  A. Yes, if there's a new victim.
7  Q. Or June 5th of 2018, were you aware
8  of any other investigation of Mr. Bearden at that
9  time?
10  A. Probably at that time. Today, I'm
11  not. I can't be for sure.
12  Q. When did you become aware that Karen
13  Kiel, also known as Karen Backues, had also filed
14  a lawsuit against Mr. Bearden?
15  A. I have no idea.
16  Q. Do you know -- so you don't know if
17  before June 5th you become aware of that?
18  A. No, I do not know that.
19  Q. What I'm trying to figure out is who
20  connects the dots at DOC? If there's multiple
21  lawsuits against the same corrections officer who
22  is watching that to say, hey, we may have a
23  problem?
24  A. Lawsuits or investigations?
25  Q. Let's talk about lawsuits.

## Page 90

1  A. Lawsuits, it would be Matt
2  Briesacher.
3  Q. And what about if there are multiple
4  connections, whose job is it to connect the dots
5  and say we've got three investigations of Mr.
6  Bearden, we've got a problem?
7  A. We know. The investigators know.
8  The PREA unit knows. It's -- like I mentioned
9  before, it's in every one of the reports, all the
10  open investigations, all the closed
11  investigations concerning a PREA allegation will
12  be noted in the report.
13  Q. Let's look at Exhibit 6. Do you see
14  Exhibit 6 on your screen?
15  A. I do, yes.
16  Q. Okay. Are you familiar with this
17  form or this investigation?
18  A. Well, it's an investigative report
19  done by Carrie and Adam. I -- let's see. Who is
20  that? It looks like Karen Backues and CO
21  Bearden. That's really all I know about it.
22  Q. Have you seen this before today?
23  A. Not that I recall, no.
24  Q. What is the date of this report? Can
25  you tell?

## Page 91

1  A. It looks like June 14th, 2018.
2  Q. So when you assigned the
3  investigation regarding Lynnsey Betz after the
4  Kansas City Star article about Mr. Bearden, were
5  you aware that Ms. Pfeifer had an ongoing
6  investigation regarding Mr. Bearden as well?
7  A. What was the date on the assignment
8  of the other case? I don't recall.
9  Q. I think it was June 5th, June 8th.
10  June 5th or 8th. It was a little bit before
11  this. We can go back to it if you want.
12  A. That's fine. I'm assuming I did
13  know, yeah.
14  Q. Did your assignment of the
15  investigation regarding Lynnsey Betz, in that
16  assignment did you say anything to the
17  investigators about looking at ongoing
18  investigations of Mr. Bearden?
19  A. I don't have to. They do that all of
20  the time. It's standard practice. Was it
21  standard practice in 2018 with this investigator?
22  I don't know. It should be.
23  Q. Okay.
24  A. Have you looked?
25  Q. No.

## Page 92

1  A. Okay.
2  Q. This is the end of this report.
3  A. Right.
4  Q. And on the summary, it seems to say
5  Backues claims she was sexually abused by Bearden
6  upward of 20 times over a six-year period and
7  then it says Backues wasn't able to recall any
8  specific date and time; do you see that?
9  A. I do see that.
10  Q. And this was unsubstantiated,
11  correct?
12  A. Exactly.
13  Q. Do you know the reasons this report
14  was unsubstantiated?
15  A. From the finding section, it looks
16  like there was absolutely no evidence other than
17  Ms. Backues' testimony. That's it. There's no
18  evidence. There's no dates, there's no times.
19  It's a late report.
20  Q. So when a woman says a guard raped
21  her, you say that there's no evidence, right?
22  MR. BUCHHEIT: Objection,
23  argumentative. Calls for facts not in evidence.
24  A. It's not enough. It's not enough
25  just to get -- if we substantiated every report