# EXHIBIT 15

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF MISSOURI
 3                      CENTRAL DIVISION
 4   KAREN BACKUES KEIL,
 5            Plaintiff,      Case No.
 6   vs.                      5:18-CV-06074-BP
 7   MHM SERVICES, INC., a
 8   Virginia Corporation
 9   JOHN DUNN, and EDWARD
10   BEARDEN
11            Defendants.
12
13      VIDEO-RECORDED DEPOSITION OF EDWARD BEARDEN
14          TAKEN ON BEHALF OF THE PLAINTIFF
15                  NOVEMBER 15, 2018
```

## Page 2

```
 1                         INDEX
 2   WITNESS:                                  PAGE:
 3   EDWARD BEARDEN
 4       Examination by Ms. McGraugh              7
 5
 6
 7                        EXHIBITS
 8   (None.)
```

## Page 3

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF MISSOURI
 3                      CENTRAL DIVISION
 4   KAREN BACKUES KEIL,
 5            Plaintiff,      Case No.
 6   vs.                      5:18-CV-06074-BP
 7   MHM SERVICES, INC., a
 8   Virginia Corporation
 9   JOHN DUNN, and EDWARD
10   BEARDEN
11            Defendants.
12          VIDEO-RECORDED DEPOSITION OF EDWARD
13   BEARDEN, produced, sworn and examined on November 15,
14   2018, between the hours of 9:48 a.m. and 3:24 p.m. of
15   that day, at the State of Missouri Attorney General's
16   Office, Fletcher Daniels State Office Building, 615
17   E. 13th Street, Suite 401, Kansas City, Missouri
18   64106 before Angela R. Corkill, a Certified Court
19   Reporter (MO), Certified Shorthand Reporter (KS),
20   within and for the State of Missouri, in a certain
21   case now pending in the United States District Court
22   for the Western District of Missouri, Central
23   Division, between KAREN BACKUES KEIL, Plaintiff, vs.
24   MHM SERVICES, INC., a Virginia Corporation; JOHN DUNN,
25   and EDWARD BEARDEN Defendants; on behalf of the Plaintiff.
```

## Page 4

```
 1                       APPEARANCES
 2
 3   APPEARING FOR THE PLAINTIFF:
 4       Ms. Susan McGraugh
         Attorney at Law
 5       Saint Louis University
         100 N. Tucker Blvd., Suite 704
 6       Scott Hall
         St. Louis, Missouri 63101
 7       314-977-7037
         susan.mcgraugh@slu.edu
 8
 9   APPEARING FOR THE DEFENDANT BEARDEN:
10
         Mr. Nicolas Taulbee
11       State of Missouri Attorney General's Office
         Fletcher Daniels State Office Building
12       615 E. 13th Street, Suite 401
         Kansas City, Missouri 64106
13       816-889-5022
         nicolas.taulbee@ago.mo.gov
14
15
     APPEARING FOR THE DEFENDANT MHM SERVICES, INC.:
16
         Ms. Carly Duvall
17       Spencer Fane, LLP
         1000 Walnut, Suite 1400
18       Kansas City, Missouri 64106
         816-292-8330
19       cduvall@spencerfane.com
20
21   APPEARING TELEPHONICALLY FOR THE DEFENDANT DUNN:
22       Mr. Kevin J. Adrian
         Brown & James, PC
23       800 Market Street, Suite 1100
         St. Louis, Missouri 63101
24       314-242-5207
         kadrian@bjpc.com
25
```

Page 49

1   A.  No, ma'am. I wasn't aware that there
2 are any fees. The way I understand it, it's the
3 state that's being sued. The reason why I'm here is
4 because my name was mentioned.
5   Q.  So you don't think that there could be
6 any financial problems or financial judgment against
7 you?
8   A.  I hope not.
9   Q.  Okay. Do you have a union
10 representative?
11   A.  No, ma'am, not that I'm aware of.
12   Q.  Okay. No one from Department of
13 Corrections has reached out to you to discuss this
14 with you?
15   A.  No, ma'am.
16   Q.  So tell me what happens after you have
17 the second PREA meeting and what happens afterwards.
18 Because you separated from Department of Corrections;
19 right?
20   A.  I retired August 31st.
21   Q.  When did you make the determination
22 that you'd retire August 31st?
23   A.  That was when my date on -- I turned
24 62 in July.
25   Q.  So when this was going on, it was also

Page 50

1 your birthday; right?
2   A.  Yes, ma'am.
3   Q.  Okay. So how does that happen? You
4 give notice?
5   A.  Sure. Yes, ma'am.
6   Q.  When did you give your notice of
7 retirement?
8   A.  Probably in May or April.
9   Q.  Is that -- you do that -- is that a
10 paper notice?
11   A.  Yes, ma'am.
12   Q.  Tell me how you have to give that
13 notice.
14   A.  You have to go to MOSERS to make sure
15 that everything is, you know, correct, and I guess
16 they -- they actually -- after you fill out all the
17 paperwork, they send a copy to the prison.
18   Q.  And you're saying you filled out that
19 paperwork in May?
20   A.  May or June.
21   Q.  Okay. When did the paperwork arrive
22 at the Department of Corrections?
23   A.  I don't know. I'm not sure.
24   Q.  Are you on full pension? Do you get a
25 pension?

Page 51

1   A.  Retirement pay.
2   Q.  Is that different between a pension
3 and retirement pay?
4   A.  Well, I don't know. I'm not aware.
5 I'm not sure. Pension would be retirement pay to me
6 in the definition.
7   Q.  How long did you work for Department
8 of Corrections?
9   A.  Nine years.
10   Q.  And when I say -- use the term when
11 does your pension vest, do you understand what I'm
12 asking?
13   A.  You're vested after five years.
14   Q.  After five years, okay. At what
15 percentage of pay, please?
16   A.  On the dollar amount?
17   Q.  Well, what -- so you get a pension
18 after five years. What are the terms of your
19 pension?
20   A.  That is all in a scale. I don't know
21 what that would be.
22   Q.  Does your pension increase if you
23 retire when you're older?
24   A.  As -- if you stay longer --
25   Q.  Right.

Page 52

1   A.  -- it will, yes.
2   Q.  I was a public defender for eight
3 years, so I have a little bit --
4   A.  Right, right.
5   Q.  -- of an idea about MOSER. All right.
6 So you retired after nine years. Your pension had
7 vested at five years. If you had stayed ten years,
8 would you have gotten a larger pension?
9   A.  I'm sure. I'm sure. With my wife's
10 illness I chose to go ahead -- after we found out for
11 sure that my wife was ill.
12   Q.  When was your ten -- when would your
13 ten-year date have been?
14   A.  November.
15   Q.  November 2018?
16   A.  Mm-hmm.
17   Q.  So if you had resigned this November,
18 you would have gotten a larger pension than resigning
19 in July?
20   A.  Just a few dollars. Wouldn't have
21 been that much difference.
22   Q.  Are you certain?
23   A.  That's what I was told, yes, ma'am.
24   Q.  Who did you consult?
25   A.  MOSERS.

Page 185

1 correct?
2     A.    That's true. That's true.
3     Q.    Did you ever have occasion to take
4 Karen to the -- to Ad Seg?
5     A.    No.
6     Q.    Transport her anywhere?
7     A.    No, no.
8     Q.    Okay. Take her --
9     A.    Excuse me.
10     Q.    Please, sir.
11     A.    That goes back to if you're not in
12 trouble, you're not going to Ad Seg, you know. I'm
13 not -- no, I've never escorted her anywhere.
14     Q.    And you recall specifically that you
15 have not escorted her anywhere; correct?
16     A.    I don't remember escorting her
17 anywhere. To my knowledge she's never been in
18 trouble. There's hundreds of other COs. Maybe --
19 maybe one of them did, you know, but, no, I have not.
20     Q.    Okay. And you -- you know to a
21 certainty because you're testifying about it that you
22 have not; correct?
23     A.    Exactly. That I have not. I don't
24 know about anybody else. I can't speak for them, but
25 I have not.

Page 186

1     Q.    Okay. And that's over what, nine,
2 nine years you were there?
3     A.    Yes.
4     Q.    Okay. And you can recall that you
5 never took her anywhere; correct?
6     A.    Correct.
7     Q.    And you can recall that you never had
8 any bad interactions with her; correct?
9     A.    Correct.
10     Q.    And you can recall she's never had any
11 violations; correct?
12     A.    Not to my knowledge. I'm not her
13 caseworker, so I wouldn't have that information.
14     Q.    Right.
15     A.    Okay.
16     Q.    Well, you had said that to me and
17 that's --
18     A.    Right.
19     Q.    -- what I was following up on.
20     A.    Okay.
21     Q.    Yeah. So you were an employee of the
22 Department of Corrections from 2011; correct?
23     A.    2008.
24     Q.    Thank you, sir. Were you always at
25 Chillicothe?

Page 187

1     A.    Yes, ma'am.
2     Q.    Did you -- did you choose to apply to
3 Chillicothe or was that where you were assigned?
4     A.    No. I chose Chillicothe.
5     Q.    Why did --
6     A.    Because I lived here in Chillicothe.
7     Q.    Yeah, okay.
8     A.    Excuse me.
9     Q.    Did you have any qualms about working
10 in a women's prison?
11     A.    No, no.
12     Q.    Are there any other prisons near
13 Chillicothe where you could seek employment?
14     A.    I could have at Cameron, I suppose,
15 but I chose not to. The drive, you know, an hour and
16 a half or whatever daily. I have worked in Moberly
17 just -- we took an offender on dialysis, two
18 officers. The female would stay with the offender in
19 the dialysis and the male would go work out, so I
20 have done that before.
21     Q.    Yeah. So your contact, all contact
22 you had with the women at Chillicothe was through
23 your employment at the Missouri Department of
24 Corrections?
25     A.    Yes, ma'am.

Page 188

1     Q.    Okay. And your contact with Karen
2 Keil, Backues Keil, was through your employment with
3 Department of Corrections --
4     A.    Yes, ma'am.
5     Q.    -- is that correct?
6     MR. TAULBEE: Let her finish.
7     THE WITNESS: Pardon?
8     MR. TAULBEE: Let her finish before
9 you start answering.
10     THE WITNESS: Oh, I'm sorry.
11     Q.    (By Ms. McGraugh) Your contact with
12 Karen Backues Keil and other incarcerated women was
13 for the purpose of fulfilling your job
14 responsibilities with Department of Corrections;
15 correct?
16     A.    Yes, ma'am.
17     Q.    Okay. You were not acting in any
18 other capacity when you interacted with the women at
19 the Department of Corrections; is that right?
20     A.    Professional?
21     Q.    Yes.
22     A.    Yes, ma'am.
23     Q.    Okay. Who was your direct supervisor
24 at Department of Corrections when you were in
25 utility?