**EXPERT REPORT OF DR. DORA SCHRIRO**

**Teri Dean, Plaintiff, v. Edward Bearden, Elijah L. Mosier, Todd E. Mustain, Kevin L. Reed, and Anne L. Precythe, Defendants, Cause No. 5:19-cv-06022, in the U.S. District Court for the MO Western District**

I.     WITNESS QUALIFICATIONS

I am a career public servant who has served as an executive-level administrator, policy maker, and homeland security advisor. Over the past 25 years, I have led two city and three state criminal justice agencies and was the founding Director of ICE's Office of Detention Policy and Planning, a civil enforcement office, in the U.S. Department of Homeland Security. I also served as Senior Advisor to DHS Secretary Janet Napolitano on Immigration Detention and Removal.

Most recently, I served as the Commissioner of the Connecticut Department of Emergency Services and Public Protection encompassing six state agencies including the Connecticut State Police, Homeland Security and Emergency Management, and Scientific Services (the state's crime lab) from 2014 through 2018. I served concurrently as Connecticut's Homeland Security Advisor from 2016 through 2018. My DHS security classification was Top Secret.

Previously, I served as the Director of two state correctional systems, the Missouri Department of Corrections from 1993 to 2001, and the Arizona Department of Corrections from 2003 to 2009. During my tenure as Director of the Arizona Department of Corrections, we were the first correctional system to be selected Winner of the Innovations in American Government awards program, for our prison-based reform, Parallel Universe, pre-release preparation in which all inmates participated from the first to the last day of their incarceration guided by norms and values mirroring those of the community. As Director of the Missouri Department of Corrections, I also served on the state's Sentencing Commission.

I also served as the Commissioner of two city jail systems, the St. Louis City Division of Corrections, from 2001 to 2003, and the New York City Department of Correction from 2009 to 2014. I was also the Warden of the Medium Security Institution, a city jail in St. Louis City, Missouri, from 1989 to 1993.

I was a member of the adjunct faculties of University of Missouri-St. Louis Department of Criminology from 1990 to 1998, St. Louis University School of Law from 2000 to 2002, and Arizona State University Sandra Day O'Connor School of Law from 2005 to 2008, over which time I taught graduate-level Criminology and Correctional Law courses and led Sentencing Seminars.  Earlier in my career, I was Executive Director of the Bergen County Planned Parenthood affiliate in Hackensack, New Jersey. Among the services that affiliate provided were medical care and counseling to victims of sexual assault.

I am knowledgeable about the case law and legislation specific to pretrial and sentenced populations, and to civil detainees, including the Prison Rape Elimination Act (PREA). I am also knowledgeable about both the American Correction Association and ICE Performance-based National Detention Standards, including PREA.  I also participated in the writing of the American Bar Association standards for both correctional systems and for ICE's system of immigration detention.

I am also knowledgeable about the operation of criminal pretrial and sentenced correctional facilities, civil detention, and the individuals in the custody of both criminal and civil justice systems.

1

I have served as a Corrections expert to the California Department of Justice, Disability Rights California, the Hampton County, Massachusetts Sheriff's Department, and the American Civil Liberties Union. I am currently engaged by the California Department of Justice, St. Louis University School of Law Clinic, and the Southern Poverty Law Center.

A complete and correct professional vita, including a list of my publications over the last ten years, is attached as Appendix A.

## II.        EDUCATION

Northeastern University, BA cum laude, 1972

University of Massachusetts-Boston, M.Ed., 1974

Columbia University, Ed.D., 1984

St. Louis University, JD, 2002

## III.        RELATED CORRECTIONAL EXPERIENCE

Recent Publications

Smart and Safe: Making the Most of Adolescents' Time in Detention, the Physical Plant, Our Workforce, and the "What Works' Literature, in The State of Criminal Justice, American Bar Association (2013)

Corrections: The Justice-Involved Mentally Ill, A Practitioner's Perspective, in The State of Criminal Justice, American Bar Association (2012)

Good Science, Good Sense: Making Meaningful Change Happen – A Practitioner's Perspective, Criminology & Public Policy, Vol. 11, No. 1, Special Issue (February 2012)

Is Good Time a Good Idea? Federal Sentencing Reporter, Vol. 21, No. 3 (February 2009)

Related Affiliations

Member, ABA Criminal Justice Standards Subcommittee and co-author, the ABA revised criminal justice standards for correctional facilities (2005 – 2008)

Recent, Related Recognition

U.S. Department of Justice, Office for Victims of Crime, Allied Professional Award, 2012

Hofstra University (Hempstead, New York) Presidential Medal, 2010

National Governors Association, Distinguished Service to State Government Award, 2006

Association of Correctional Administrators, Michael Francke Award for Outstanding Leadership, 1999

## IV.     OTHER CASES

I testified recently as an expert by deposition in the matter of Endicott v. Hurley et al., No. 2:14-CV-107 DDN (E.D., N. Div.). I have not testified as an expert in any other case during the past four years.

## V.   COMPENSATION

My standard hourly rate is $250.

## VI.     ASSIGNMENT

I have been asked to provide a Statement of Opinions concerning certain conditions of confinement which Teri Dean (Ms. Dean), an inmate currently assigned to the Women's Eastern Reception, Diagnostic and Correctional Center (WERDCC) in Vandalia, Missouri, encountered while confined at the Chillicothe Correctional Center (CCC) in Chillicothe, Missouri, and WERDCC, both secure women's correctional facilities, as set forth in Teri Dean, Plaintiff, v. Edward Bearden, Elijah L. Mosier, Todd E. Mustain, Kevin L. Reed, and Anne L. Precythe, Defendants, Case No. 5:19-cv-06022-SRB. The conditions of confinement to which Ms. Dean has been subjected as an inmate during her incarceration in the Missouri Department of Corrections (the department) concern (1) sexual harassment and sexual assault by Correction Officer I Edward Bearden, Correction Officer II Elijah L. Mosier, Correction Officer I Todd Mustain E., and Correction Officer I Kevin L. Reed, former and current state employees, (2) retaliation by members of the department, and (3) the failure on the part of Department Director Anne L. Precythe to ensure the agency complies with federal law and Department policy including law and policy to prevent, detect, and respond to offender sexual abuse, sexual harassment, and retaliation.

The facts and data upon which I relied in preparing this Statement included Case No. 5:19-cv-06022-SRB, conversations with Ms. Dean, the MODOC Department Procedure Manual D1-8.13 Offender Sexual Abuse and Harassment, the MODOC Employee Handbook dated January 2018, the 2016 and 2019 CCC Prison Rape Elimination Act (PREA) Audits, the Department's 2010 – 2019 Annual PREA Reports, the lawsuits also filed by Ms. Keil, Ms. Betz, Ms. Zieser, and Ms. Jane Doe, the CCC PREA investigations of Ms. Keil, Ms. Betz, Ms. Zieser, Ms. Dean, and Ms. N.G., of sexual harassment and sexual assaults by Department employees, and other material produced by defendants through discovery. I also referred to the Prisoner Rape Elimination Act Prisons and Jail Standards, National Standards to Prevent, Detect, and Respond to Prison Rape under the Prison Rape Elimination Act (PREA) 28 C.F.R. Part 115, Docket No. OAG-131, RIN 1105-AB34 (U.S. Department of Justice, May 1, 2012); A National Protocol for Sexual Assault Medical Forensic Examinations Adults/Adolescents, Second Edition (U.S. Department of Justice, Office on Violence Against Women, April 2013); National Best Practices for Sexual Assault Kits: A Multidisciplinary Approach (U.S. Department of Justice, National Institute of Justice, 2017); Form SSV-2, Survey of Sexual Victimization, State Prison Systems Summary Form (U.S. Department of Justice, 2017), and the American Correctional Association Adult Correctional Institution Standards, 5th Edition and 2016 Standards Supplement.

3

**OPINIONS**

I.  Teri Dean's reporting of staff-on-inmate sexual abuse by CO Edward Bearden, COII Elijah Mosier, CO Todd Mustain, and CO Kevin Reed during her incarceration at the Chillicothe Correctional Center is supported by the facts.

II.  Teri Dean's reporting of retaliation by department staff at the Chillicothe Correctional Center and the Women's Eastern Reception, Diagnostic and Correctional Center for litigating sexual abuse by CO Edward Bearden, COII Elijah Mosier, CO Todd Mustain, and CO Kevin Reed, is also supported by the facts.

III.  CO Bearden, COII Mosier, CO Mustain, and CO Reed had the means and opportunity to repeatedly sexually abuse Teri Dean and they caused her to suffer physical and emotional injury.

IV.  The Missouri Department of Corrections failed to provide the protection owed Teri Dean, an offender in the state's custody.

V.  The failure of Missouri Department of Corrections and its agents to adequately assess and act upon offenders' complaints of staff sexual abuse caused them to suffer needlessly.

4

I.  **Teri Dean's reporting of staff-on-inmate sexual abuse by CO Edward Bearden, COII Elijah Mosier, CO Todd Mustain, and CO Kevin Reed during her incarceration at the Chillicothe Correctional Center is supported by the facts.**

A.  There are two forms of Staff-on-Inmate Sexual Abuse. They are Staff Sexual Misconduct and Staff Sexual Harassment. Staff Sexual Misconduct is any behavior or act of a sexual nature directed toward an inmate by an employee, volunteer or contractor, official visitor or other agency representative, whether consensual or non-consensual and including intentional touching unrelated to official duties; or with the intent to abuse, arouse, or gratify sexual desire, or completed, attempted, threatened, or requested sexual acts; or indecent exposure, invasion of privacy, or voyeurism or sexual gratification. Staff Sexual Harassment is repeated verbal comments or gestures of a sexual nature to an inmate by an employee, volunteer or contractor, official visitor or other agency representative, including demeaning references to gender, or sexually suggestive or derogatory comments about body or clothing; or repeated profane or obscene language or gestures. See Form SSV-2, Survey of Sexual Victimization, State Prison Systems Summary Form (U.S. Department of Justice, 2017).

B.  Ms. Dean was the subject of repeated staff sexual harassment and sexual misconduct by four correctional officers during her incarceration at the state's Chillicothe Correctional Center (CCC) in Chillicothe, Missouri. Correction Officer I (CO) Edward Bearden sexually abused Ms. Dean from June 2012 through July 2018. Correction Officer II (COII or Sergeant) Elijah L. Mosier sexually abused Ms. Dean from 2013 through October 2018. CO Todd E. Mustain sexually abused Ms. Dean between late 2012 and August 2018. CO Kevin L. Reed sexually abused Ms. Dean every day that she worked in the kitchen in December 2017. CO Bearden, COII Mosier, and CO Mustain had been investigated on numerous other occasions for the sexual abuse of female offenders at CCC. CO Reed was removed from the facility in the fall of 2018.

C.  CO Bearden sexually abused Ms. Dean and other female offenders at CCC.

CO Bearden sexually abused Ms. Dean from June 2012 through July 2018 when he took family medical leave through his resignation effective September 1, 2018. She was subjected to both sexual harassment and sexual misconduct by CO Bearden.

CO Bearden abused other female offenders in the same manner during this period. Ms. Karen Keil was the subject of sexual harassment and sexual misconduct by Bearden from 2013 to her release in 2017. Ms. Lynnsey Betz was the subject of sexual harassment and sexual misconduct by Bearden in the spring of 2016. Ms. Ashley Zeiser was the subject of sexual harassment and sexual misconduct by Bearden in 2015 and 2016. Ms. N.G. was the subject of sexual harassment and sexual misconduct by Bearden between September and November 2017. Ms. Jane Doe, an alias, was the subject of sexual harassment and sexual misconduct by Bearden between May 2015 and November 2017. Ms. Keil, Ms. Betz, Ms. Zeiser, and Ms. Doe have filed complaints in federal district court.

5

1. Sexual Misconduct. Ms. Dean was subjected to sexual misconduct by CO Bearden in number of locations and on a number of occasions. One of Ms. Dean's work assignments was the barbershop. Every time that she cut his hair, he would grope her, running his hands up her legs and rubbing his head between her breasts while he sat in the barber's chair.

   Ms. Dean was not the only offender Bearden sexually abused in the barbershop. N.G. also worked in the barbershop and she was also subjected to Bearden's sexual misconduct while cutting his hair. MDOC-001719.

   CO Bearden sexually assaulted Ms. Dean in other areas of the facility as well. He repeatedly engaged in sexual misconduct in the utility closets in HU 7 and in the recreation building, and prior to the department's elimination of cross-gender pat searches in 2015, he also sexually assaulted her in the course of conducting pat-down searches outside the mess hall after meal service. It is believed he probed her so aggressively, he could determine when she was wearing a sanitary product.

   Ms. Keil was also subjected to Bearden's sexually abusive activity. Her first encounter with him also occurred during pat-down searches as she was leaving the mess hall after dinner. That evening and on many other occasions thereafter, while patting her down he would rub his hands from her breasts down past her lower waist and over her crotch area. Ms. Keil told the investigator she felt uncomfortable to go anywhere at CCC because she feared encountering him. MDOC-001688.

   CO Bearden seized upon similar circumstances to sexually assault Ms. Betz at her work assignment in the vocational tech building. As she attempted to pass through a doorway to an office, he blocked her path sufficiently so that she had to turn to her side to pass him without coming into contact, at which moment he reached out and grabbed her crotch. The next day, he followed her into a supply closet while she was at work, kissed her forcibly and attempted to remove her pants and underwear. He succeeded at penetrating her digitally.

   Ms. Doe was also a subject of Bearden's sexual misconduct. He forced her to perform sexual acts in the storage area of the vocational tech building where she attended cosmetology classes beginning in November 2016. He sexually assaulted her repeatedly throughout the year-long course.

2. Sexual Harassment. CO Bearden sexually harassed Ms. Dean in a number of ways as well.

   He verbally assaulted her. During her shifts in the barbershop, he would remark, "My boys are shaven," and "I have a man-cut down there."

   He also gestured to her in a sexual manner, pointing to his groin area, suggesting the length of his penis while she was working in the barbershop.

   It was not uncommon for Bearden to also make unsolicited, sexually suggestive comments about her appearance, and to gesture. The "bubble" is a control center, a workstation encased in glass windows, at the intersection of corridors from which the assigned officer directs movement, a place through which all offenders must pass when moving through the facility.  When Ms. Dean passed by the bubble, Bearden would direct her, "Come touch this"

6

and "look at my bulge," gesturing at his penis. Of note, the bubble is the same "no-offender-contact post" to which the facility reassigned Bearden in July 2018 after the press inquired about his employment status when the third lawsuit naming Bearden a defendant was filed. It afforded no protection at all.

Other female offenders also reported sexual harassment by Bearden. He made unwanted comments to Ms. Keil about her appearance and to Ms. Betz of a sexually suggestive nature. He also traced an outline of his genitals and said to Ms. Zeiser, "Yeah, you'd like that." He told Ms. Doe, "I'd like to get you from behind," and "I'd sure like to see you sit on that [a phallic-shaped Christmas ornament] and spin." He displayed his pubic hair with a distinctive racing-stripe and told her, "I did this for you baby, I did this for you."

3. CO Bearden harmed Ms. Dean and other offenders physically and emotionally at CCC.

D. COII Elijah L. Mosier sexually abused Ms. Dean and other female offenders at CCC.

Ms. Dean was subjected to both sexual harassment and sexual misconduct by COII Mosier from 2013 through October 2018, when she was transferred from CCC to WERDCC. He sexually abused other offenders at CCC in the same manner.

1. Sexual Harassment. COII Mosier's sexual harassment of Ms. Dean began in 2013 when she was assigned to HU 7 and it continued until her transfer to WERDCC in October 2018. Mosier watched from the doorway to her room in the housing unit as she dressed and undressed, and made sexually suggestive comments such as, "Let me see your boobs," and "I'll be at your room at 7:15."

2. Sexual Misconduct. Mosier's sexual assaults of Ms. Dean began early in 2014 when she was assigned to work in the barbershop and continued through July-August 2018. As had Bearden abused both her and N.G. in the barbershop, COII Mosier also repeatedly sexually assaulted Ms. Dean at that work assignment. He pushed her against the walls, rubbed his hands over her, put his hands down her pants, and kissed her against her will.

Mosier also attacked and assaulted Ms. Dean in the utility closets and the laundry-storage areas in HU 1 and HU 7, as had Bearden. Mosier's sexual assaults of Ms. Dean numbered 20 to 30; 10 to 12 of which included digital penetration.

Mosier also brought her gifts, all of which was contraband, as he had for D.H., J.W. and T.B., and none of which did she accept.

In "exchange" for his many liberties, Mosier would "write off" the room she shared with her roommates; meaning, as a sergeant he could ensure their room would not be searched.

The facility was alerted to a relationship Mosier was having with another offender at CCC. Although she denied it when questioned by investigators, she continued to tell Ms. Dean about their encounters until that offender transferred to WERDCC.

3. Four other women assigned to CCC also accused COII Mosier of sexual abuse during this time frame. Ms. D.H. was the subject of both sexual harassment and sexual misconduct by

Mosier in 2009. He also brought her alcohol. Ms. T.W. was sexually harassed by him in 2010 before and during his military deployment. Ms. J. W. was also the subject of sexual harassment and sexual misconduct by Mosier in 2010. He brought her contraband items as well. Ms. T.B. was another subject of sexual harassment and sexual misconduct by Mosier in 2019. Mosier also introduced contraband items including drugs for her in exchange for sexual favors.

4. CO Mosier harmed Ms. Dean and other offenders physically and emotionally at CCC.

E. CO Todd E. Mustain sexually abused Ms. Dean between late 2012 and August 2018. He sexually abused other female offenders as well at CCC. Ms. Dean was subjected to sexual harassment and sexual misconduct by COII Mosier. He abused other women in the same manner.

1. Sexual Harassment. CO Mustain sexually harassed Ms. Dean with explicit comments such as, "I've been waiting to see what you looked like down there since you got here."

Mustain verbally abused other female offenders. In September 2018, an officer reported overhearing on the room intercom system, Ms. J.W. (Jessica Williams) tell another offender that Mustain had asked her to show him "her boobs" while he was working the med line in the north wing of HU 2. MDOC-002412. In December 2018, Ms. J. W. reported another incident, "About 7:20 pm Mr. Mustain come to my door to ask me for my ID and Mustain said first you have to let me see your breasts. I didn't say nothing. When med nurse came at 10:40 I refused meds... It happen 12-7-18." MDOC-002413.

In 2019, Ms. C.T. reported, when returning to her HU after working out, Mustain called her over to the "bubble," the same post where Bearden had harassed Ms. Dean, when he was assigned to that post. He reminded her that she needed to have her ID at all times and that he had warned her before but since she "gets all sweaty and he likes it that way," "she needed to be in her room either topless or naked when the wing is quiet and he is making his rounds."

2. Sexual Misconduct. CO Mustain also sexually assaulted Ms. Dean in the utility closets in HUs 5, 6, and 7, where, on four or five occasions, he followed her into the closets then rubbed his genitals against her and tried to kiss her.

Other female offenders at CCC were known to have been sexually assaulted by Mustain during this time frame.

In 2012, numerous inmates told investigators that Mustain sexually assaulted Ms. S.K. (Sara Beth Klein) in several back offices in HU 6. They were also consistent in their reporting that he brought her perfume in a Visine bottle, put money on her commissary account, and wrote her letters including one in which he issued her an ultimatum – ten days to decide whether she would live with him when she was released from prison in which case, he would tender his resignation now. Mustain was administered a lie detector test. The

8

investigator concluded he did not show deception so, despite all the information to the contrary, he determined, "There was not substantiating evidence recovered to support the incident type noted above [sexual abuse of inmate by employee]." MDOC-002213.

In November 2016, the facility was notified via the Crime Tips Hotline that Ms. D.S. had left a message stating she had been raped by Mustain. She denied making the call and Mustain denied the allegations, "It is believed by this officer this is an attempt to punish this officer for past violations and or property removal from cell searches." The investigator focused on who placed the call, not the veracity of the caller's comments. Mustain was not administered a lie detector test and the case was closed, the finding, no statute or policy violation. MDOC-002261.

In 2019, two cellmates informed a facility unit manager of several inappropriate officer-offender relationships at CCC including CO Mustain and Ms. D.L. whom they reported, he had sexually assaulted. They also reported Mustain had extracted another officer who had been locked in the cell of a female offender with whom he was having a sexual relationship, by that offender, and Mustain had failed to report it. They added, Mustain "hung out" in the doorways in the housing units and expressed concern that he was a bad influence on other officers. The investigation which followed, referenced ten earlier investigations of allegations of sexual abuse by CO Mustain between 2012 and 2019, five of which were closed as unfounded and five as unsubstantiated. MDOC-00291. Another officer also reported to have sexually abused D.L., resigned during the investigation of Mustain's abuse of her. MDOC-002288. The investigator decided the two cellmates had colluded and were not credible.

3. CO Mustain harmed Ms. Dean and other offenders physically and emotionally at CCC.

F. CO Reed sexually abused of Ms. Dean at CCC. Ms. Dean was subjected to both sexual harassment and sexual assaults by CO Reed.

CO Kevin L. Reed sexually abused Ms. Dean every day she worked in the kitchen in December 2017.

1. Sexual Harassment. CO Reed made many sexually aggressive comments and gestures to her. These included, "I want to bend you over this desk," "I'd like you to get on top of me and sit on it," and "I'd like to get you on the office desk," and on more than one occasion, he would brandish a banana, cucumber, or a carrot, and say he was "bigger than that," referring to the size of his penis.

2. Sexual Misconduct. Reed frequently summoned Ms. Dean to a closet in the kitchen where cleaning supplies were secured. There, he rubbed himself against her body and grabbed her breasts.

3. CO Reed was escorted out of CCC in late September-early October 2018. The department did not provide any information about his employment history including other PREA allegations or the reasons for his removal.

4. CO Reed harmed Ms. Dean physically and emotionally at CCC.

G. Ms. Dean did not report the sexual abuse to which she was subjected to any prison official. She was certain she would not be believed, and that she would sent to "the hole" which is to say, reassigned to administrative segregation, at least until the investigation was completed, which was frequently six to eight or more months. It was her belief, women who were assigned to segregated housing could not see their family, work, or participate in prison programs. The program she especially prized was Parents and Their Children (PATCH), special 4-hour visits at CCC for moms and their children. It was her only opportunity to reconnect with her younger son, Christian. To qualify, the offender had to have excellent institutional conduct. Her older son had passed away earlier in her incarceration. Christian is all the family she now has. She feared she would not be able to participate in PATCH if she lodged a PREA complaint.

Ms. Dean did not remain silent, however. She talked about the abuse with two other inmates, R.F. and A. M. and continued to talk with Ms. A.F. after she was released. When they talked about Bearden, they referred to him as "Dexter," the name Ms. A.F. had given her puppy. Ms. Dean did everything that she believed she could to protect herself from being put in "the hole" and to maintain her relationship with her surviving son.

H. As is the case with so many other sexual assault survivors, Ms. Dean worried that there was something wrong with her, that somehow this was her fault, that she should have been able to prevent the officers' advances. She experienced shock, disbelief, isolation. She was anxious, felt paranoid, and had difficulty sleeping. She didn't eat well, and her Crohn's symptoms worsened.

She also felt abandoned. Her sexual abuse by CO Bearden, COII Mosier, CO Mustain, and CO Reed continued long before and after the department opened its investigation of her allegations of their sexual harassment and misconduct. It continued in part, because the department never reassigned any of these repeatedly named officers to another facility or put them on leave pending completion of a full and fair investigation. It continued because the department allowed it to continue.

It is my opinion, what Ms. Dean accomplished was nothing short of remarkable. She is an offender; she has no rank, no standing in a para-military organization. She is an offender who was repeatedly abused by a sergeant and three officers throughout most of the first third of a lengthy sentence and then, harassed by other officers before and after her transfer from CCC to WERDCC. She did not act out or try to harm herself. She focused on her son and she used the resources available to her – first and continuously, the department's grievance procedure and only later, counsel and the court – to hold them accountable and to prevent further harm to herself and others.

10

I.   Ms. Dean was admitted to the Department in 2012, sentenced to serve a term of 23 years. Her earliest release date is in 2029; the latest in 2035. She has many years left to serve.

J.   Ms. Dean is not the only inmate at CCC who has filed a lawsuit against one or more of these defendants for sexual abuse.

   1.   On May 29, 2018, Ms. Keil filed Case 5:18-cv-06074-BP in the U.S. District Court for the Western District of Missouri. CO Bearden is a named defendant.

   2.   On June 5, 2018, Ms. Betz filed Case 5:18-cv-06079-FJG in the U.S. District Court for the Western District of Missouri. CO Bearden is a named defendant.

   3.   On July 2, 2018, Ms. Zieser filed Case 5:18-cv-06103-FJG in the U.S. District Court for the Western District of Missouri. CO Bearden is a named defendant.

   4.   On December 16, 2019, Jane Doe filed Case 5:19-cv-06161-BP in the U.S. District Court for the Western District of Missouri. CO Bearden is a named defendant.

II.  **Teri Dean's reporting of retaliation by department staff at the Chillicothe Correctional Center and the Women's Eastern Reception, Diagnostic and Correctional Center for litigating sexual abuse by CO Edward Bearden, COII Elijah Mosier, CO Todd Mustain, and CO Kevin Reed, is also supported by the facts.**

A.   Ms. Dean was sentenced to the department in 2012 to serve a term of 23 years and she was assigned to CCC. Sexual abuse by CCC correctional staff began within months of her incarceration. In 2018, when referred finally to a mental health counselor per the department's PREA protocol, he wrote in his report, "She just took it as a part of prison life." Memorandum, Greg Link, LCSW, to DW Kim Herring, July 30, 2018. It is my opinion; she was correct in her assessment. It was a part of prison life, hers and many other offenders, before and after the department adopted Procedure Manual, DI-8.13 Offender Sexual Abuse and Harassment, based on available information in 2015, establishing "zero tolerance for offender sexual abuse and harassment." However, the department's promise "to reduce and prevent sexual abuse and sexual harassment" and "to monitor and protect victims from retaliation" did not materialize for her or other offenders. Procedure Manual, DI-8.13 Offender Sexual Abuse and Harassment, III Procedures, 9. Protection Against Retaliation.

B.   Within several weeks of being identified by another inmate as a possible victim of staff sexual abuse, a COIN Event, dated July 12, 2018, was generated putting the department on notice. An investigator monitoring Ms. Dean's phone calls heard her tell the other party that she planned to file a lawsuit. He reported they were talking about CO Bearden. DW Herring wrote to PREA Manager Strum, "I am certain the offender is referencing being the victim of sexual abuse by this staff member." Memorandum, 931-4151, Request or Investigation, July 13, 2018. As soon as staff learned on that call of her plan, she began to experience harassment and other retaliatory

11

measures by department personnel. What she did not experience is any intervention protecting her from further sexual abuse.

When her attorneys discovered the officers had never been reassigned, and demanded they be moved immediately, Ms. Dean was transferred instead, in the middle of the night, from CCC to WERDCC, where PATCH visits are not available.

The transfer to WERDCC did not alleviate the retaliation she encountered at CCC. She continued to experience questionable searches, unwarranted conduct violations, the loss of better paying jobs and other restrictions of earned privileges, and unjustified and unjustifiably lengthy assignments to "the hole."

C.  Despite all the unwarranted and untoward attention that she received, Ms. Dean's institutional record remained good. Her custody classification is 1-5 meaning, low to no propensity for violence; all but one infraction that she incurred were minor in nature. Based upon information and belief, most of the time, she qualified for honor dorm status and PATCH visits.

D.  It is my opinion; since the department's discovery that she was the victim of staff sexual abuse, both facilities' surveilled her aggressively, and the penalties she sustained, often for roommates' conduct, and usually the result of questionable searches, were unwarranted, disproportionate, and retributory. Several stand out.

1.  Chillicothe Correctional Center.

    a.  On February 13, 2018, during another dormitory search, Ms. Dean received a violation for Theft when several slices of ham and sausage links and two yellow onions that a roommate admitted to taking and placing in her cooler, were found. Teri had moved the cooler from her locker to a common area for several days while Maintenance repaired it and that is when her roommate put the "purloined food items" there. The Maintenance Department acknowledged in a memo it had run out of replacement lockers and locker repairs were in arrears.  It did not matter.  She received a 20-day living area restriction, her TV was impounded for 30 days, and she was required to pay $3.05 for the food items that her roommate had obtained from another inmate on the yard and stored there. Disciplinary Action Report CCC-18-660, and Offender Grievance CCC-18-164.

    b.  Ms. Dean experienced other forms of retaliation at CCC. She was placed in temporary administrative segregation (TASC), an assignment that should not be but is often as restrictive as disciplinary segregation, in July 2018 pending completion of a drug investigation during which time, her property was searched, photos damaged, coffee spilled on other possessions, and the calendar and journals she used to record the dates and time of her abuse, confiscated. Upon being cleared of any wrongdoing, it was months before she regained one of the facility's few higher paying jobs. Her legal mail was opened not in her presence and presumably, read. Although enrolled in a chronic care clinic for her Crohn's condition, her medication never followed her to and from

12

each assignment to "the hole." Prescheduled PATCH visits with her surviving son was curtailed on one occasion and cancelled on another.

2. Women's Eastern Reception-Diagnostic and Correctional Center.

   a. In mid-April 2019, during a search, a COII found several "nuisance" contraband items in her possession. In fact, her work supervisor allowed the women who worked in the laundry routinely to "trade out their clothing." There was no basis in policy to issue Ms. Dean a violation; but that did not deter the sergeant from pulling Ms. Dean's personal property inventory (PPI) then "observe" several articles of jewelry, two silver colored rings and a wooden cross necklace, were not on her inventory. She issued Ms. Dean a deadline of April 29, 2019, just two business days away, to submit "adequate" documentation that these items belonged to her, a deadline difficult for any offender to meet given their limited access to phones, their property secured in facility storage, and the staff members needed to help them gather that information. Conduct Violation Report, WERDCC-19-221, 24.1 Any Unauthorized Articles, April 29, 2019.

   Ms. Dean met the deadline. She produced her copy of the facility's property transaction form receipt for the necklace which she had purchased while at CCC and soon after, the Property Room Sergeant located its paperwork and corrected his record. She also provided photos of herself at CCC wearing the rings.

   The photographs did not suffice. She was still written up for being in possession of unauthorized articles.

   Within a week of the two-day deadline, she submitted two letters, one from her supervisor dated May 3, 2019, and the other from another civilian who worked in the laundry dated May 6, 2019, both attesting she had come from CCC with the rings and always wore them. Ms. Dean requested reconsideration, was denied, and appealed.

   Ms. Dean's attorney, Ms. Jenifer Snow, also communicated with AAG Michael Pritchett on May 15, 2019, and he replied in full on May 17, 2019. The information he received from the department and conveyed to Ms. Snow appeared to differ from the various reports generated in the course of the corresponding disciplinary and grievance processes. AAG Pritchett concluded no inappropriate action was taken.

   On August 16, 2019, Teri prevailed in part. The department's Adult Institutions Division (DAI) Deputy Director agreed with custody staff that she had failed to provide proof of ownership and denied her appeal to expunge the violation but, he allowed her to mail home the two rings at her expense, give them a visitor for safekeeping, or donate them, within 30 days. In sum, the administration acknowledged the rings were hers and allowed her to keep them, but not in her possession for the remainder of her incarceration. Ms. Dean was right; it appeared officers were never wrong. Grievance Appeal Response, WERDCC-19-203.

13

b. Also, on April 29, 2019, the date of the deadline, staff conducted a search of her room, confiscated four CDs, a combination lock, a tube of glue stick, and a roll of tape, and wrote her up for theft and contraband. Conduct Violation Report, WERDCC-19-203, 22.1 Theft and 24.1 Contraband, April 29, 2019.

This search was strikingly similar to the previous one at CCC. She was charged with theft for items found in the common area, in a locker that was not hers, and she was disciplined, not her cellmate. Informal Resolution Request, WERDCC-19-203, May 13, 2019, Informal Resolution Request Response, WERDCC-19-203, Other, June 14, 2019, and Grievance Response, WERDCC-19-203, Other. Ms. Dean persisted in her appeal, "The items I was written up for were not mine and were not in my area... It is my belief I am being targeted by staff as reprisal for my pending lawsuit." Offender Grievance Appeal, WERDCC-19-203, July 29, 2019.

The DAI Deputy Director upheld this violation as well and this time, this time made no accommodation. The grievance response, he said, adequately addressed her complaint about the April 29, 2019 conduct violation for theft. Grievance Appeal Response, WERDCC-19-203, Other, August 16, 2019.

c. Ms. Dean persevered, first by filing an IRR and then, a grievance about "numerous instances of harassment and retaliation" since her plan to litigate was made known. Informal Resolution Request Response, WERDCC-19-222, Harassment, May 22, 2019.

The department pushed back, denying staff acted in a retaliatory or harassing manner and it having anything to do with any of "her legal matters." Offender Grievance, WERDCC-19-222, Harassment, June 24, 2019.

She responded, "There is a DOC policy which forbids staff from retaliating ("no reprisal") against offenders who bring lawsuits, yet it still happens here. It has not deterred staff..." Grievance Appeal, WERDCC-19-222. July 4, 2019.

The department's position was infirm on its face. Although it had established that the "bag of rags" she took from the laundry had been with the permission of her work supervisor, the justification for the subsequent search and conduct violation seemed to argue otherwise, "Because you were caught taking contraband back to your housing unit on a previous occasion, staff believed you could make future attempts at securing contraband."

3. It is my opinion; the department failed to take the necessary steps to protect Ms. Dean from retaliation. Department MDOC Procedure Manual D1-8.13, Offender Sexual Abuse and Harassment, specifically provides in Section III. Procedures, F. Reporting Sexual Abuse or Harassment, 9. Protection Against Retaliation, a. The PREA site coordinator will ensure all victims are monitored and protected from retaliation, and b. Following any reported incident of sexual abuse or harassment, (1) monitoring for retaliation will be conducted for a

14

*minimum* of 90 days, and 2.d. If the possibility of retaliation is suggested, the PREA site coordinator will act promptly to remedy such retaliation and protect the individual.

There is no indication that the department's PREA Manager, PREA site coordinator, or any other administrator acted affirmatively on her behalf, to monitor and protect her from retaliation. Facility, division, and department responses to her efforts to resolve these differences were the same: You are wrong. This should resolve your complaint. No further action is required.

Ms. Dean made repeated good faith efforts to seek redress and secure relief by pro-social means, utilizing the department's offender grievance system, starting with requests for informal resolution and then by filing formal grievances. MDOC Procedure Manual, D5-3.2 Offender Grievances. And, when she lodged complaints of retaliation for reporting and then litigating sexual abuse, neither the department's PREA Manager, the facility's PREA Coordinator, nor any other administrator offered her protections afforded by federal law and department policy.

III. **CO Bearden, COII Mosier, CO Mustain, and CO Reed had the means and opportunity to repeatedly sexually abuse Ms. Dean and they caused her to suffer physical and emotional injury.**

A. Every inmate must follow any order of a correction officer, and any correction officer can write-up an inmate for failing to do so. Overall, the word of the correction officer is presumed to be true, and that of the inmate, untrue. As such, remaining incident-free throughout an offender's incarceration can be very difficult to do. Women are especially reluctant to confront correctional personnel, particularly concerning sexual abuse. In part, this is because inmates receive far less information than does staff about the department's PREA policy and the rights it affords them. In part, this is because the likelihood that they will not be believed is great, as is their fear that an unsubstantiated or unfounded finding which is often the case, will embolden their abusers and increase the likelihood of retaliation. As was the case with Ms. Dean, retaliation, frequently in the form of write-ups, often results in significant, sustained loss of privileges. These depravations include the suspension of PATCH visits, loss of a better paying inmate work assignment, imposition of housing unit restrictions, the impounding of their TV, and time in "the hole." It can also cost them earned good time credit and push back their release date.

1. By and large, women receive far fewer visits than do men who are incarcerated. Women are more likely to visit their male partners in prison and bring their children to see them than are women likely to see their male partners or their children during their incarceration. PATCH visits were created in part to help overcome this disparity so that incarcerated moms can maintain contact with their children and be more successful as parents upon reentry.

2. Work also impacts the offender's conditions of incarceration. To lose one's job in prison is to become both indigent and idle, two debilitating and demoralizing conditions, more so for

15

female offenders. Women are less likely to have anyone "to put money on their book," that is, deposit funds to their inmate account to make purchases from the commissary. And, the department will not allow just anyone to leave money for an offender. Ms. Dean was disciplined when a neighbor who attended church with her son, deposited funds to her account. She was accused of accepting the money for a cellmate who had been placed on a limited spend. CCC Conduct Violation Report, 17-324, April 7, 2017.

3. Offenders' reporting of sexual abuse usually results in their reassignment to segregated housing for several reasons, none of which is experienced by offenders as desirable. One rationale is to temporarily separate the victim from her assailant(s) in the least restrictive setting which all too often is TASC pending completion of the PREA investigation. A second purpose is punishment for guilty parties – guilty of sexual misconduct or guilty of falsely reporting sexual misconduct – upon the completion of the investigation. The third is protective custody, a placement of indefinite duration for vulnerable individuals during the investigation and sometimes after its completion, in conditions as severe as disciplinary segregation. In sum, whether the intent of the placement is to protect or to punish; overall, most offenders experience any assignment to segregation as punitive. Locked down most of the day, there is no access to work, school, visits, phone calls or commissary.

4. Regardless of the reason that a victim of sexual abuse is put in "the hole," the potential consequences for reporting staff sexual abuse is always chilling. It is my opinion; to achieve a better result, the department should make better information about PREA readily available to offenders and utilize alternatives to all forms of segregation whenever possible.

B. At various intervals throughout their employment, CO Bearden, COII Mosier, CO Mustain, and CO Reed received information and instruction on professionalism and work performance. All of them were informed of their responsibilities as department employees and of offenders' rights.

1. Department employees sign receipt of the Employee Code of Conduct, thereby committing "to abide by and enforce MDOC department policy D2-11 Employee Standards and D2-11.10 Employee Conduct." They also sign acknowledgement forms for various documents including, the Employee Handbook, Maintaining Professional Relationships with Offenders, Staff Sexual Misconduct and Harassment, and beginning with the adoption of D1-8.13, Prison Rape Elimination Act (PREA)-specific Training. Along with its adoption, the department also required all staff assigned to a female facility to complete gender-specific training, "Working with the Female Offender," before assuming their assigned post. D1-8.13, III Procedures, B. Human Resources, 4. PREA Training, f. Gender-Specific Training.

2. Additionally, CO Bearden, who also served as a field training officer (FTO) at CCC, provided facility-specific instruction to staff upon their assignment to the facility.

3. The same cannot be said for information inmates in the department's custody received about its efforts to eliminate prisoner sexual abuse.

16

a.  Ms. Dean was admitted to the department before D1-8.13 was put into place. When she was first confronted with staff sexual abuse, she was resigned that "It was just a part of prison life, and it was. The abuse she sustained did not stop when D1-8.13 was adopted.

b.  D1-8.13 states, "The department will provide PREA-related education in formats accessible to all offenders. It continues, "The PREA site coordinator will make key information readily available or visible to all offenders through PREA posters, the offender rulebook, and the offender brochure on sexual abuse and harassment." D1-8.13, III Procedures, C. Reception and Orientation, 6. Offender Education, a and b. The procedure never specifies what constitutes either the "PREA-related education" or "key information" they were to receive.

    It was Ms. Dean's experience, when the department implemented D1-8.13, she received a form to sign, and posters were placed in the housing units and other areas where offenders congregated, and there has been no other informational outreach since then. Unlike department staff who received training upon its adoption, and regularly thereafter, offenders have had little to no instruction. What Ms. Dean and other offenders who continued to be sexually abused did learn, is that the PREA policy did not change offending staff's conduct.

C.  CO Bearden, COII Mosier, CO Mustain, and CO Reed demonstrated heightened awareness of the ways to circumvent the PREA policy and employed them all to avoid getting caught or to be held accountable.

1.  They all knew the locations of the facility's security cameras, what they covered, and whether they were working. There was none in the supply, utility, and chemical closets, offices, the control room, or in housing units other than the dayrooms. There were only a few in the vocational tech and recreation buildings, kitchen and barbershop, and corridors. They also knew there was a 30-day retention policy and that there were too few investigators to randomly scan video recording footage.

2.  They all knew the low traffic times in the facility; among them, nights, weekends, and holidays, when sergeants were the most senior staff on the shift, as well as offices outside of business days and hours, and roving posts most any time.

3.  They all knew the facility was short staffed and they took advantage of the lack of uniformed supervisors and supervision and the shortage of line officers.

    D1-8.13 specifically designated officers in the rank of lieutenant or greater to conduct and document unscheduled and unannounced rounds to identify and deter offender sexual abuse and sexual harassment. D1-8.13, III Procedures, 13.  CCC had few officers in the rank of lieutenant and above. Lieutenants were deployed primarily as the shift supervisor and the remainder, usually reported business days and hours to specific office assignments.

    Additionally, CCC has a greater need for female officers than most other facilities to fill gender-specific job assignments. D2-2.22 Job Assignment Bids, II. Definitions, C.

CCC's geographic location compounds both its shortage of uniformed staff overall and female officers in particular. Until such time that staffing levels are increased, or the inmate census decreases, routinely reassigning posts and backfilling vacant positions on overtime will likely continue, and likely continue to facilitate staff sexual abuse.

Even Defendant officers' access to the facility at the front gate and adjacent staff locker rooms, as evidenced by the variety of contraband they introduced to secure offenders' silence, suggests there were either no or poorly executed searches of their person and property upon their entry and exit. Increased supervision and oversight are needed now.

4. Defendant officers all counted on offenders' reluctance to report, and the department's reluctance to take the word of an offender over theirs; again, for good reason. Bearden, Mosier and Mustain were all investigated on numerous occasions for the sexual abuse of female offenders and it appears that only once was one of the four, then-CO Mosier, found to be at fault for failing to report inappropriate attention an offender supposedly directed towards him; and he was later promoted to sergeant. Only Reed has been removed from the facility, the reason not known; and he is employed at another state agency.

Ironically, retaliation is the explanation often provided by Defendant officers, and accepted by the department, when confronted with female offenders' reports of sexual abuse.

a. In July 2009, Mosier was accused of sexually harassing and assaulting a female offender at CCC. He argued he was the victim. "He [Mosier] admitted that I/M D.H. was always flirtatious with him. She did make comments to him about how good looking he was, how good he smelled, she would like to get with him when she gets out of prison, and things of this nature. He did not take any formal actions against her for making these types of comments. He did not report these comments to his supervisor, and he did not document these incidents. … he believes that had he corrected I/M D.H. for making comments to him he would not be in his position." Investigative Report, Case #2009050130, July 22, 2009. A disciplinary request was submitted for the lesser offense of failure to report; no information is available as to its outcome.

b. In November 2016, the facility was notified via the Crime Tips Hotline that Ms. D.S. had left a message stating she had been raped by CO Mustain. She denied making the call and he said it was not true, "It is believed by this officer this is an attempt to punish this officer for past violations and or property removal from cell searches." MDOC-002252. He was not charged.

c. In February 2019, when two cellmates reported extensive sexual misconduct by CO Mustain involving a number of offenders, they were accused of collaborating. DW Herring informed Warden McBee, "I believe their allegations are in retaliation for being upset by staff on 3rd shift." MDOC-002314-002315. He was not charged.

Administrative staff's apparent reluctance to see inmates as individuals and to recognize their needs as such is troubling. Upon identification of Ms. Dean as a potential victim of staff sexual abuse, the department delayed her access to a mental health provider and chaplain, fundamental protections provided in D1-8.13 for sexual abuse victims, for several weeks

18

until she was questioned by an investigator. Email RE: 931-4151, Request for Investigation, from PREA Manager Sturm to DW Herring, July 16, 2018.

Similarly, when administrative staff did submit requests for investigations, they did so in a dismissive manner. In October 2012, Capt. Carr wrote, "So-called witnesses and documentation has been received that indicate CO Mustain might be having sexual relations with inmate S.K." MDOC-002162. On July 13, 2019, PREA Manager Sturm wrote to DW Herring, "… we are going to open a new case on *this girl*," referring to Ms. Dean. Email, to Kimberly Herring from Vevia Sturm, RE: 931-4151, Request for Investigation.

Senior staff's execution of its grievance policy also illustrates these biases. Each Informal Resolution Request and Formal Grievance Ms. Dean submitted was timely. Each submission raised an issue for which objective information and other forms of evidence was provided. Each was substantiated with statements from cellmates who assumed responsibility for the misconduct, or civilian staff members who affirmed the veracity of her statements. Every administrative staff's response merely restated the initial charges.

D.  It is my opinion CO Bearden, COII Mosier, CO Mustain, and CO Reed all demonstrated the predatory behaviors of a sex offender.

Defendants selected individuals who would be reluctant to report them, women fearful of losing their PATCH visits, work assignment, or a forthcoming parole date, women of low self-esteem, women who had been previously sexually abused, women who had a lot of time to serve or with young children waiting at home, or no one waiting for them – women like Ms. Dean.

These officers' conduct as aggressive as it was, was also deliberative; they appeared to be careful even as they got more comfortable and grew more aggressive in their assaults so as to continue to abuse her, by avoiding being discovered and reported. When Bearden assaulted Ms. Dean as she cut his hair in the barbershop it so unnerved her that on two occasions, she drew blood and he did not report it. When Mosier repeatedly subjected her to sexual misconduct, far more frequently than any of her other abusers, he knew he could count on his rank of sergeant to secure her silence. Nor was Mustain concerned. He had been investigated numerous times and suffered no consequences. Reed took advantage of their work schedules; he assaulted Ms. Dean in the pre-dawn hours when staffing was its lowest level and the population still locked in.

E.  At its core, executive staff failed to adequately acknowledge and address a fundamental tension endemic to the field and permeating this department – officer versus offender. This conflict is evident in its selection and promotional processes, training program, supervision strategies, investigatory activities and disciplinary actions. Sworn and civilian staff alike, regardless of rank or position, still struggle to objectively weigh the veracity of accusers and the accused. All too often, they still fail to take the definitive measures to achieve the desired outcomes – the safety and wellbeing of both the population and department personnel.

It is my opinion; the administration's inclination to support staff is so strong, and its desire to show the most improvement possible so great, that both reporting and reports of offender sexual abuse are suppressed, intentionally or otherwise. Specific to the reporting and resolution of Ms. Dean's sexual abuse, this conflict manifested itself in several troubling ways.

19

1. The time to open Ms. Dean's PREA investigation was protracted and its closure, premature.

    One to two weeks after receiving a credible report that Ms. Dean was the subject of staff sexual abuse, she was overheard on July 12, 2018, on a phone call monitored by an investigator, that she planned to sue the department for sexual abuse.

    PREA Manager Strum opened a case the next day on July 13, 2018, but directed DW Herring the following Monday, July 16, 2018, not to issue a Coordinated Response until an investigator had questioned her.

    Ms. Dean was not asked for her written statement until July 20, 2018. Offender Statement, July 20, 2018, 13:44 hours. She confirmed, "Mr. Bearden has been doing sexual pat searches and sexual touches all throughout my time here."

    She was not referred for medical and mental health assessments until July 30, 2018, ten days after her initial statement was taken. Referral and Screening Note-Health Services, July 30, 2018. She spoke with Institutional Counselor Link the same day. He notified DW Herring, "… other officers have touched her inappropriately during haircuts and other times." Memo from Greg Link to Kim Herring re: Dean, Teri, July 30, 2018. The request for a second investigation was initiated.

    PREA notifications were not made until July 31, 2018. PREA Allegation Notification Checklist-Institution.

    On August 1, 2018, PREA Investigation 2018-07-0055 was revised combining both investigations. On August 2, 2018, Ms. Dean met with chaplaincy services.

    Less than two months later on October 4, 2018, the department closed its investigation before its completion.

2. On October 9, 2018, Ms. Dean was transferred involuntarily to WERDCC in the middle of the night. Her attorneys, upon learning of her continued abuse by remaining Defendant officers, had demanded their transfer. They told her it was a "temporary" out-count; and not that she had been reassigned to another facility.

3. The department took no measures to move CO Bearden or other officers at any time.

    a. CO Bearden remained at CCC until his retirement in good standing on September 1, 2018.

    b. CO Reed was escorted from CCC in late September or early October 2018 for reasons not known; upon information and belief, he is employed by another state agency.

    c. COII Mosier remains at CCC and continued to abuse Ms. Dean until October 2018 when she was moved to WERDCC.

    d. CO Mustain also remains at CCC and continued to abuse her to August 2018, the last time his work assignment was proximate to her.

20

4. Ms. Dean was subjected to harassment and other forms of retaliation at CCC and WERDCC. She brought the department's attention to these situations utilizing the Offender Grievance procedure.

5. At no time, did the Department take substantive action to protect Ms. Dean.

6. It is my opinion; Defendant officers employed well-documented patterns and practices to sexually abuse Ms. Dean and many other female offenders over a number of years and for all those years, they were allowed to hide in plain sight.

## IV. The Missouri Department of Corrections failed to provide the protection owed Ms. Dean, an inmate in the state's custody.

A. The Department is responsible for the care, custody and control of all the inmates in its custody. The duty of care that it owes to every inmate includes freedom from all forms of sexual abuse and sexual harassment. 28 CFR Part 115, Prison Rape Elimination Act National Standards.

To this end, the Department issued a written policy mandating zero tolerance toward all forms of sexual abuse and outlining its approach to preventing, detecting, and responding to such conduct. Department Procedure Manual D1-8.13 Offender Sexual Abuse and Harassment.

Department Procedure D1-8.13, Offender Sexual Abuse and Harassment, is the Department's policy establishing zero tolerance for offender sexual misconduct and harassment and delineating its strategies and responses to reduce and prevent offender sexual abuse and harassment. The Department's effort is led by the PREA Manager selected and supervised by the Department Director with the help of a PREA site coordinator at the level of deputy warden or higher at each facility who is designated by the Director of Adult Institutions. III. Procedures, A. General Information, 4. and 6.a. There are also ten PREA investigators, several of whom are assigned to the CCC. It is my opinion, the Department failed to implement 28 CFR Part 115, Prison Rape Elimination Act National Standards, in a manner that provides the protection owed Ms. Dean and other offenders during their incarceration.

Key to the commitment that the Department prevent, detect and respond to all forms of staff-on-inmate sexual abuse is compliance with a number of factors. The Department failed to meet its mandate in the following ways.

1. Personnel Selection. Department policy requires all paid, unpaid (volunteer) and contract employees undergo background and records check. Only applicants with convictions must not be offered employment. D1-8.13 III. Procedures, B. Human Resources, 1. a-c.

a. CO Bearden worked previously for the State of Missouri at the Department of Transportation as a crew leader from 1983 to 2001. He was involuntarily terminated following an incident of sexual harassment of a female co-worker. See Form MO 931-1419 (1-08), D. Employment Record.

21

b. The department hired Bearden nonetheless as a Correction Officer I in 2009.

c. No information about the screening and selections of COII Mosier, CO Mustain, and CO Reed was available for review.

2. Staff Training. All new staff shall receive initial PREA training during the department's basic training and refresher training every two years. The PREA manager shall provide information about the department's sexual abuse and sexual harassment policy via the intranet. D1-8.13, III Procedures, A. Human Resources, 4. PREA Training, a-d. Additionally, all new staff members placed at a female facility shall receive gender-specific training prior to being placed at a post. D1-8.13, III Procedures, A. Human Resources, 4. PREA Training, f. 1.Gender-Specific Training.

The PREA Annual Training Acknowledgement requires of all staff, "I… have a statutory obligation to report ALL forms of offender sexual abuse and/or sexual harassment." MDOC-002622. PREA training materials direct PREA instructors to inform staff, "When sexual abuse occurs, … a crime has occurred. That crime has a victim and alleged perpetrator. The fact that the victim is an offender does not matter. These incidents must be followed-up, they must be investigated. Our Department has an obligation for us to complete these tasks without fail." MDOC-000984.

The lawsuits filed by Ms. Dean, Ms. Keil, Ms. Betz, Ms. Zeiser, and Ms. Doe evidence these outcomes were not realized.

a. Over the nine years that CO Bearden was employed by the department, he attended or took on-line, a patchwork of classes about offender sexual abuse including "Working with the Female Offender," "Staff and Offender Relations" ("It Could Never Happen to Me"), "Anatomy of a Set-Up," a warning to staff that inmates will try to entrap them, and PREA refresher training, one or two to eight hours each in duration. MDOC 000628 – 000639.

b. No information about the pre-service and in-service instruction COII Mosier, CO Mustain, and CO Reed completed was available for review. It is assumed to have been comparable to that taken by CO Bearden.

c. It is also assumed CO Bearden, COII Mosier and CO Mustain did not receive the gender-specific training referenced above as they were already assigned to CCC when the department adopted D1-8.13. No information about CO Reed's dates of employment and assignment to CCC was available for review.

d. Additionally, CO Bearden also served as a Field Training Officer at CCC. MDOC 030255.

3. Performance Reviews. Department staff is evaluated prior to the completion of their probationary period and annually thereafter.

a. CO Bearden's annual performance ratings were Average, with "knowledge of work" beginning his first year of employment with a score of 4 of out 10 and ending his last year of employment with a score of 6 out of 10. Similarly, "quality of work" his first year of

22

employment started with a score of 5 out of 10 and ended his last year of employment with a score of 7 out of 10.

There was no accounting on any of Bearden's rating sheets for (i) time and attendance, (ii) administrative and criminal investigations opened, pending, and completed, and (iii) PREA allegations and outcomes.

b. No information about the probationary and annual assessments that COII Mosier, CO Mustain, and CO Reed received was available for review.

4. Retention. Procedure Manual, Offender Sexual Abuse and Harassment, stipulates, "Offender sexual abuse by a department staff member is a felony and could result in the requirement to register as a sex offender. D1-8.13, III. A. 3. The Employee Handbook acknowledgement and receipt form states, "The Department holds all employees responsible for abiding by and adhering to all policies and procedures." MDOC-002630. The Maintaining Professional Relationships with Offenders Acknowledgement Form affirms, "I acknowledge the Department maintains a zero tolerance in regard to sexual misconduct and all other forms of avoidable contact with offenders." MDOC-002629.

The lawsuits filed by Ms. Dean, Ms. Keil, Ms. Betz, Ms. Zeiser, and Ms. Doe are evidence to the contrary. Based upon information and belief, none of the four Defendant officers was terminated for offender sexual abuse.

a. The department hired CO Bearden despite his questionable employment history. He completed the pre-service and in-service training provided and received below-average to average job performance evaluations during his tenure. He engaged repeatedly in unlawful sexual misconduct with female offenders in his care and under his control throughout his employment and was investigated by the department on six separate occasions. Bearden remained at CCC, and as an FTO also continued to train other officers, until his resignation in good standing effective September 1, 2018.

b. Similarly, COII Mosier and CO Mustain were known to PREA investigators, having been investigated on previous occasions. Then-CO Mosier was found guilty of sexual misconduct but was promoted subsequently to COII. Case #2009050130. CO Mustain was the subject of ten prior investigations. MDOC-002291.

Both Mosier and Mustain continue to be employed by the department. Only CO Reed was escorted from the facility grounds in fall 2018 but his employment with the state was not terminated. Upon information and belief, he is working currently for another state agency.

c. Both Mosier and Mustain remained at CCC and continued to sexually abuse Ms. Dean after the PREA investigation was opened in July 2018 and the lawsuit was filed in February 2019. In October 2019, upon her attorneys learning of their continuing abuse

of her, and demanding their transfers, the department transferred Ms. Dean instead, to WERDCC.

    d. Both Mosier and Mustain continue to work at CCC.

5. Staffing Levels and Video Monitoring. Department policy commits it will maintain staffing plans for each facility that provides adequate levels of staffing to protect offenders against sexual abuse. D1-8.13, III Procedures, 3. General Information, 11. Department policy also requires there are sufficient working, recording video cameras. Supervision and Monitoring, and Procedure D4-4.8, Security Camera Operations. Whether staffing levels are adequate and there are sufficient working camera, is a function of facility capacity, the facility's average daily population, and the population's assessed needs and risks.

CCC's designated capacity is 1,636 adult female offenders across all custody classifications. The physical plant consists of general population and administrative segregation housing, medical, mental health, and substance abuse units, and central services and programs services, as well as an administration building, state garage and powerhouse. There are 14 buildings on the 55-acre fenced campus. The most recent census information available is a one-day snapshot from the June 2019 PREA Audit at which time, there were 1,425 adult female offenders and 307 security staff, presumably encompassing all ranks from the Correctional Superintendent to Correctional Officer. It is unclear however, whether the 307 sworn personnel referred to funded or filled positions. See 2019 CCC PREA Audit, p. 4.

    a. Department policy requires the staffing plan consider blind spots and areas where staff or offenders may be isolated, the composition of the offender population, and the prevalence of substantiated and unsubstantiated offender sexual abuse allegations when considering its adequacy. See D1-8.13, III Procedures, A. General Information, 11.

    b. The policy also requires the facility comply with its staffing plan, document staffing deviations, and provide justification for deviations in staffing. See D1-8.13, III. Procedures, A. General Information, 12.

    c. It also requires the facility ensure sworn staff in the classification of lieutenant or above conducts and documents unscheduled and unannounced rounds to identify and deter offender sexual abuse. See D1-8.13, III. Procedures, A. General Information, 13.

    d. The typical correctional facility, a male facility, consisting of multiple custody classification levels, dormitory and cell housing, and general and special populations, has on average, 1 officer: 5.1 inmates; this is otherwise known as the inmate-to-total officers/sworn supervisor ratio. See ASCA Staff: Inmate Ratio Survey at Newshttps://www.prisonlegalnews.org/media/publications/ASCA%20Responses%20Sta ff%20to%20Inmate%20Ratio%20Survey,%20Association%20of%20State%20Correctional %20Administrators,%202010.pdf.

A women's prison is not the typical correctional facility, however. Staffing studies have shown the needs and nature of interactions of female offenders and sworn personnel differ from the interactions of their male counterparts. Among the security staffing issues associated with a women's correctional facility is the demand for additional security staff to transport female offenders to and from off-site health care facilities, and to escort them to and from on-site medical, mental health, and program services.

The roles and responsibilities of security staff in women's facilities also differ from those in men's facilities, increasing security staff's workload in a women's facility. These additional duties include monitoring their physical and mental health and pregnancies, and addressing their day-to-day concerns, further engaging those who require personalized attention. Traditional security-related tasks, such as searching and supervising female offenders as well as escorting them also tend to take longer, more so when male officers are assigned as their interactions often activate cross-gender provisions for offender supervision.  Also, of note when staffing a women's correctional facility is how male officers are deployed. Although most agencies including the MDOC, have special provisions in their policies for cross-gender staffing and/or posts, few require a specific ratio of male officers to female offenders to accommodate those time-on-task differences. Prison Staffing Analysis: A Training Manual with Staffing Considerations for Special Populations, U.S. DOJ National Institute of Corrections, 2008.

Staffing inequities manifest in troublesome ways. For example, the department requires staff of one gender to announce themselves upon entering the housing unit where offenders of the other gender are housed. It also prohibits cross-gender viewing. It is noteworthy that in 2016, a PREA auditor determined cross-gender viewing was occurring during security checks in CCC's segregation and crisis level units but did not recommend or require any modifications to the physical plant or agency policy, nor did the department self-initiate any corrective measures. 2016 CCC PREA Audit Report, p. 2. It is also well documented that Defendant officers moved freely through CCC's housing units without being announced or challenged.

All the Defendant officers leveraged to their advantage, areas in the facility that had no, or limited staffing levels, and areas covered by roving not fixed posts.

e.  In 2019, the department reported CCC used 449 video cameras to surveil the facility's 14 buildings and grounds. This number is not as large as it may appear. CCC has four general population dormitories with 38 multiple occupancy, multi-story housing units and a 58-cell administrative segregation unit plus medical, mental health and substance abuse units, support, program, visitation and administrative areas, the powerhouse and state garage, each of which has its own combination of wings, corridors, storage closets, breakrooms, restrooms and stairwells. 2019 PREA Audit Report, p. 3.

In 2015, the department reported additional video cameras had been requested to enhance video monitoring.  2014 PREA Annual Report, p. 4.  A recent memo from

Physical Plant Supervisor III Coffman to CCC PREA Investigator II Pfeifer confirmed, "The facility has not added any additional cameras to the general population housing units since its construction in 2008. The laundry room cameras are original equipment."

All the Defendant officers leveraged to their advantage, areas in the facility that had no, insufficient, or inoperable, cameras.

f.   Monitoring offender phone conversations and mail are two other means by which CCC identified and investigated serious violations of department rules and unlawful conduct. CCC lacked the investigative staff to perform these functions as much as needed.

In 2014, a facility investigator discovered while monitoring phone conversations that CO Bearden had engaged in off duty conduct with a former female offender, and he recommended that the matter be referred to AIO. No information was provided to indicate whether this recommendation was acted on, or its outcome. Ms. Keil, another sexual assault victim, reported in her deposition that CO Bearden had directed her in 2018 to memorize his personal phone number because he wanted her to call him after her release. Several days before a scheduled parole hearing in February 2018, Bearden left a sticky note for Ms. Doe at her workstation in the vocational tech building, "You know who this is from," and listed a phone number. Later that day, he told her, "If you don't call me, there's going to be consequences." Soon after making that threat, he approached her in the yard and said to her, "That phone never rang." CO Bearden also directed Ms. Zieser, another offender he abused, to leave notes of a sexual nature for him in his locker.

In 2018, an institutional investigator confirmed while reviewing Ms. Dean's recorded phone calls that Bearden had sexually abused her during her incarceration at CCC.

When Ms. Dean was first identified, a WERDCC PREA investigator requested additional resources from his supervisor, to find and follow leads by monitoring more recorded conversations at his facility. No information was provided by the state to suggest these resources were allocated.

Ms. Keil, another offender abused by Bearden, also reported in her interview with the investigator that he had mailed a card to her at the facility while she was an inmate. It was not intercepted by the facility Mail Room staff upon its receipt, or by the staff who delivered it to her, or conducted subsequent institutional searches of her property.

g.   The most reliable measure of sufficiency, or adequacy, is the outcome; specifically, whether female offenders come forward to report abuse, investigations are objective, thorough and timely, temporary segregated housing assignments are only employed when no lesser means will suffice, and the frequency and ferocity of staff sexual abuse falls. Based upon the available information, which is limited, female offenders at CCC continue to be subjected to staff sexual abuse.

26

During the most recent 12 months of the 3-year PREA reporting period, the facility recorded 186 PREA allegations including 93 allegations involving sexual contact by staff or offenders (50%) and 93 allegations involving sexual harassment by staff or offenders (50%). 2019 CCC PREA Audit Report, pp. 5 – 6.

    i.    Sexual Contact. The 2019 PREA Audit Report noted 93 allegations of sexual contact of which, 60 were inmate-on-inmate (65%) and 33 were staff-on-inmate (35%). Of the 60 inmate-on-inmate allegations, six were substantiated, ten unsubstantiated, 32 unfounded, and 12 investigations not completed. Of the 33 staff-on-inmate allegations, three were unsubstantiated, 14 unfounded, and 16 investigations not completed.

    ii.    Sexual Harassment. The 2019 PREA Audit Report also noted 93 PREA allegations of sexual harassment of which, 78 were offender-on-offender (84%) and 15 were staff-on-offender (16%). Of the 78 inmate-on-inmate allegations, 13 were substantiated, 36 were unsubstantiated, 26 unfounded, and three investigations not yet completed. Of the 15 staff-on-inmate allegations, one was substantiated, four were unsubstantiated, eight 8 unfounded, and two investigations not yet completed.

    iii.    Outcomes. Over one-third, 33 of 93 sexual contact allegations, involved staff whereas 78 of 93 sexual harassment allegations, almost 85 percent, involved inmates only. In essence, when staff was involved in offender sexual abuse, most often it involved sexual contact including penetration.

        Also, of concern is that almost one-third, 28 of 93 investigations of allegations of offender sexual abuse (30%), were not yet completed whereas most allegations of sexual harassment, 88 of 93 (95%) had been completed, suggesting insufficient investigative resources, inadequate supervision, or both.

6.    Practice the Zero Tolerance Policy. Department policy states it has a zero tolerance for all forms of offender sexual abuse, harassment, and retaliation but its protocols and practices impede realization. D1-8.13 Offender Sexual Abuse and Harassment, I. Purpose.

    a.    Assessing Offenders' Vulnerability for Sexual Assault by State, Contract, and Unpaid Employees (Volunteers). Department policy only requires all inmates are assessed at intake and periodically thereafter for victimization of, and by, other inmates, but not victimization by state, contract, and unpaid employees. Although the policy recognizes members of the workforce may sexually abuse offenders, it does not require an assessment of their risk. III. Procedures. C. Reception and Orientation. 1, 1.a., b., and c., and 3a. The assessment of female offenders should be gender specific; that is, the questions normed and the scoring validated for a female population.

27

b.  Reporting Sexual Abuse. Department policy provides more than one way to report sexual abuse including anonymously, by means of informal resolution, the formal grievance process, to a staff member, the PREA hotline, an advocacy agency, or to the Department of Public Safety, Crime Victims Services Unit. D1-8.13, III. Procedures. F. Reporting Sexual Abuse or Harassment, 1. a. - d., 2. a. - b., and 3. Offenders used most of these means repeatedly to report sexual abuse, and their reports were rebuffed by department staff. A call to the hotline was rejected outright. Grievances were dismissed. Even a monitored phone call validating a previous report by another offender, and a conversation between two offenders overheard by an officer in a housing unit, were insufficient to explore and to elevate reports of sexual abuse.

c.  Administrative Segregated Housing. As noted above, department policy provides both temporary administrative segregation confinement and indefinite administrative segregation housing may be used (i) temporarily, pending the outcome of a risk assessment, or to protect the victim, witness, and/or other offenders assisting the victim during a PREA investigation; (ii) indefinitely, to protect an at-risk offender or the victim, witness, and/or another offender assisting the victim, following the outcome of an investigation or the risk assessment; and (iii) for a specified term, as punishment for the victim, witness, and/or other offender assisting the victim, found to be intentionally lying in the course of sexual abuse investigations. D1-8.13, III. Procedures, H. Segregated Housing in Institutional Setting. And, when the assignment to administrative segregated housing is (iv) involuntary, ordinarily it should not exceed 30 days. D1-8.13, III., H. 5.

Because the department commits it will employ the least restrictive means when it has been determined an offender is at high risk of victimization, policy stipulates segregated housing should be used as a last recourse but that is rarely the case. D1-8.13, III. Procedures, H. Segregated Housing in Institutional Setting, 1., 1.b.2. and 1.b.4., and 2.a., 3. The effect of the provision to use special housing, and the department's reliance upon special housing, is chilling. It discourages reporting and should be discontinued.

There are less restrictive means. Although the department has been unwilling to do so, it could, and in a number of instances should, temporarily reassign suspect staff members to another facility. Instead, Warden McBee asked CO Bearden early in June 2018 whether *he* had any concerns about working inside the facility. Email, June 5, 2018, from the Warden to Deputy Warden Crews. When Bearden was finally moved to a "no-offender-contact post," it remedied nothing. Email, July 2, 2018, from Warden McBee to David Savage. Bearden was temporarily reassigned to CCC's control room, a post from which he also sexually harassed Ms. Dean and CO Mustain sexually harassed Ms. C.T.

d.  Offender Concerns about Credibility. Many victims of sexual abuse are fearful they will not be believed should they come forward to report sexual abuse. This is true in the community and more so in prison, where female offenders also worry, they will be punished. They have cause to be concerned.

i. The department's standard of proof when deciding a PREA investigation is preponderance of evidence, enough proof to show that something is more likely to have occurred than not to have occurred. D1-8.13, II. Definitions, X. Preponderance of Evidence. Although administrative investigations shall not impose a greater standard, rarely do offenders prevail in PREA investigations of staff sexual abuse. D1-8.13 III. Procedures, J. Investigations. Section I includes several notable examples of PREA investigations gone array. MDOC-002213, MDOC-002261, MDOC-002288.

ii. Department procedure D1-8.13 establishes the PREA Offender Management Team which may be convened when an inmate displays a pattern of behavior that includes three or more sexual abuse or harassment investigations with findings of unfounded within specified timeframes. D1-8.13, III. Procedures, N. PREA Offender Management Team, 1. Although none of the women abused by Defendant officers were referred to the Team, Ms. Dean and the others knew about it and feared they could be.

iii. There are also provisions to protect sexual abuse victims and witnesses to sexual abuse, by putting them in segregated housing for protective custody needs. D1-8.13, III. Procedures, H. Segregated Housing in Institutional Setting, 1. a-c. The conditions of detention in segregated housing are in accordance with institutional services procedures regarding segregation units – severely restricted. D1-8.13, III. Procedures, H. 3.b. Protection should not be punitive.

iv. Staff threats of inmate write-ups are credible. Staff routinely threaten to write up inmates, and frequently they do. Immediately after the release of the COIN notification, Ms. Dean told Mr. Link, that staff was treating her differently. Even the officer who escorted her to meet him had confronted her, "I don't believe he [Bearden] did this." She told Link she was "afraid of repercussions." Memo, Link to Herring, RE: Dean, Teri, July 30, 2018. Since then, she has submitted numerous grievances seeking relief from staff retaliation as she prepared, and then pursued, her claims in the court. CCC-18-164, WERDCC-19-221, WERDCC-19-222, and WERDCC-19-203.

7. Impeded Access to Emergency Medical Treatment and Crisis Intervention Services. Department policy states victims of sexual abuse will receive timely, unobstructed access to emergency medical treatment and crisis intervention services. D1-8.13, III. Procedures, I. Health Services Care, 1.

a. Department policy states in the event of an allegation of a penetration act, the first responder shall request the victim not take any actions that may destroy physical evidence including washing, brushing teeth, and changing clothes.

COII Mosier sexually assaulted Ms. Dean by means of digital penetration ten to 12 times in a utility closet and the laundry room/storage area in HU 1, punitive segregation, and

29

in the utility closet and laundry room in HU 7 between 2013 and 2018. When he assaulted her, she was afraid to push him off of her because of his elevated status, Correctional Sergeant. She was concerned that pushing him away could result in him sending her to "the hole," destroying her room, and confiscating her possessions, all of which were penalties to which she has been subjected during her incarceration.

b. Department policy states when the alleged perpetrator is a staff member, the victim shall be transported to the community emergency room for a sexual assault exam.

COII Mosier's status and her well-founded fear deterred her from coming forward and receiving timely, unobstructed access to sexual assault exam by a SANE or SAFE provider and other emergency medical treatment.

c. Department policy states victims of sexual abuse are also assured timely, unobstructed access to crisis intervention services.

COII Mosier's status and her well-founded fear further deterred her from seeking crisis intervention services.

8. Core Accountability. The Department failed to protect Ms. Dean. Defendant officers' actions and administrators' inaction caused her to suffer severe physical and emotional trauma.

a. Defendant officers were uniformed correctional personnel assigned to the Chillicothe Correctional Center within the Division of Adult Institutions, Missouri Department of Corrections. At least three of the four of her assailants had been the subject of other PREA investigations.

i. CO Bearden was not discrete. He was open, obvious, and aggressive in his conduct. CO Bearden singled out Ms. Dean in June 2012 and continued to abuse her through July 2018 when he left on family medical leave. On multiple occasions in the barbershop, he would grope her. He also ran his hands up her legs and rub his head in-between her breasts. He abused her in this manner each time she cut his hair.

He forcefully sexually assaulted her in utility closets in HU 1 and HU 7 and the Recreation building where he would push her up against the wall and slide his hands under her shirt some 12 to 15 times. In addition to groping her, his pat searches were also violative of her person.

Bearden also made numerous sexual gestures and egregious sexual comments to her in the barbershop where she was assigned to work, and the "bubble," a post to which he was assigned, when she passed by.

  ii. COII Mosier was not discrete. He was open, obvious, and aggressive in his conduct. COII Mosier singled out Ms. Dean in June 2013 and continued to abuse her verbally and physically through October 2018 when she was transferred to WERDCC.

    Mosier pushed Ms. Dean up against walls in the barbershop, pressed himself against her, and rubbed his hands all over her. He stuck his hands down her pants and kissed her against her will.

    Mosier attacked and assaulted Ms. Dean in the utility closets in HU 1 and HU 7, and the laundry room/storage area in HU 1. He attacked and assaulted her between 20 and 30 times, ten to 12 physical assaults included digital penetration.

    Mosier frequently watched Ms. Dean dress and undress and made numerous sexually suggestive comments to her as he watched. He attempted to give her gifts.

  iii. CO Mustain was not discrete. He was open, obvious, and aggressive in his conduct. CO Mustain singled out Ms. Dean late in 2012 and abused her verbally and physically through August 2018, the last time she put in "the hole."

    CO Mustain attacked and assaulted Ms. Dean in utility closets in HU 5, HU 6, and HU 7 four to five times. He rubbed his private parts over her clothes and tried to kiss her.

    Mustain also directed sexually explicit remarks towards her.

  iv. CO Reed was not discrete. He was open, obvious, and aggressive in his conduct. CO Reed verbally and physically assaulted Ms. Dean in a sexual manner every day that she was assigned to work in the kitchen, which was during December 2017.

    Reed directed her to the kitchen's chemical closet where he would rub against her body and grab her breasts over her clothing.

    Reed also made sexually aggressive comments and gestures to her. He brandished pieces of fruit and vegetables in a sexually explicit manner.

 b. Appointed Officials, Senior Managers and Administrators at headquarters and in the Division of Adult Institutions including CCC and WERDCC share in the responsibility for the sexual abuse of Ms. Dean.

  i. The Superintendent is the chief operating officer and facility administrator. There is a Superintendent at both CCC and WERDCC. The Superintendent's immediate supervisor is an Assistant Director for Adult Institutions.

  ii. Three are three Assistant Directors for the Division of Adult Institutions, one for each of the three zones, with each zone encompassing seven correctional facilities. The Assistant Directors' immediate supervisor is the Director of the Division of Adult Institutions.

iii.  The Director of the Division of Adult Institutions oversees the operation of the division's three zones and 21 correctional facilities. Upon information and belief, the Director is also its Division's appointing authority.

The Director of the Division of Adult Institutions also selects the PREA Site Coordinator for each of the 21 correctional facilities.  D1-8.13, III. Procedures, A. General Information, 6., 6.a.

iv.  The PREA Site Coordinator is a facility employee at the level of deputy warden/ associate superintendent or greater, someone who has "sufficient time and authority" to assume these duties. Each Site Coordinator is responsible for that facility's compliance with the PREA standards. D1-8.13, II Definitions, V. PREA Site Coordinator.

v.  The PREA Manager is responsible for the implementation and compliance of the Department's PREA policy and program.  D1-8.13, II Definitions, S. PREA Manager.

vi.  The Department Director establishes department policy and procedure and secures the resources for its implementation. The Department Director is ultimately accountable for its activities and outcomes. The Director of the Division of Adult Institutions and the PREA Manager report to the Department Director.

9.  Investigative Integrity and Organizational Transparency. Agencies and individuals in their employ make mistakes, errors in judgement, not integrity, administrative errors, not criminal violations. What distinguishes the better from the bad organization is how quickly and comprehensively the agency assesses and acts upon its assessments to prevent reoccurrences and improve outcomes.

Despite numerous, substantive complaints, Defendant officers Bearden, Mosier, and Mustain, all of whom were investigated on multiple occasions for PREA violations, remained in good standing with the Department throughout their employment. They retained their assignments to CCC, even after Ms. Dean filled her complaint with the U.S. District Court for the Western District of Missouri in February 2018, and they continued to sexually abuse her. Only CO Reed was escorted off DOC premises and he remains a state employee at another agency.

10.  In sum, it is my opinion, department senior staff has failed to adequately acknowledge and address whether the uniform matters, whether officers are always trustworthy, and offenders are not, especially in situations where it matters most, prisoner sexual abuse. It permeates staff selection and promotional processes, the training program, supervision strategies, acquisition and allocation of resources, investigatory activities, and disciplinary actions. It is also evident in the assessment of offenders at intake and periodically thereafter, its dissemination of information to the population, enforcement of rules and regulations, problem-solving processes, housing assignments, and staff assignments and supervision. Sworn and civilian staff alike at every rank evidence difficulty objectively

weighing the veracity of accusers and the accused, treating everyone fairly, on a level playing field, regardless of rank or role.

Based on information and belief, PREA training for DOC personnel and the inmate population is inadequate, and there are insufficient security staff, investigators, video cameras and monitoring, and supervisory oversight to prevent, detect, and respond timely to offender sexual abuse at CCC. It is my opinion, the department should allocate more resources to, and place greater emphasis on, preventing, detecting, and responding to offender sexual abuse allegations sooner, and completing and closing cases more quickly. I recommend the department:

a. Establish male-to-female staffing ratios for CCC, adjust the uniformed staffing levels for male and female officers, increase security rounds by correction officers, and unannounced security checks by supervisors in the rank of lieutenant and above at CCC.

b. Increase routine monitoring of offender phone calls, mail, and video cameras by facility investigators, and increase or reallocate PREA investigators, to resolve the backlog of PREA allegations and complete thorough investigations of incoming complaints within aggressive but achievable time frames.

c. Install more video cameras, ensure all cameras are recording, and increase routine video retention beyond 30 days.

d. Improve the information and instruction given to staff and expand to include offenders. PREA information should be provided to the population with the same frequency as staff, training for staff should be more pointed, and training for investigators, supervisors and managers address bias towards staff and retaliation of offenders.

e. Discontinue segregation housing for administrative purposes; in its place, create and use non-punitive housing capacity.

f. Heighten the awareness of investigators and administrators to staff retaliatory actions and take decisive steps sooner to deter and undo its adverse effect.

**V. The failure of Missouri Department of Corrections and its agents to adequately assess and act upon other offenders' complaints of staff sexual abuse caused them to suffer needlessly.**

A. Missouri was among the first states to report that it complied with PREA but that is not case. The PREA auditors found all the components of 28 C.F.R. Part 115 in place during both audits, in 2016 and 2019 and still, the Department repeatedly failed to follow the procedure it promulgated to comply with federal regulation as identified in Sections I, II, III, and IV of this Report.

B. The department has failed to satisfy all D1-8.13's minimum operational requirements to accomplish just processes and achieve a just outcome – the timely identification of at-risk offenders and eradication of staff sexual abuse. PREA sets out minimum standards to eliminate

33

prison rape but an agency may need to do more to reach and to sustain this goal. It is my opinion that this department is such an agency. Defendants' PREA procedure failed repeatedly to prevent, detect, and respond to Ms. Dean over the years she was sexually abused by Defendant officers at CCC and retaliated against at CCC and WERDCC by others. This Report identified other offenders who were also harmed by department employees during their incarceration, more than the annual reports and three-year audits indicate.

C.  Over one-third of all substantiated incidents of sexual assault and sexual harassment reported by the department in its last four year-end publications, were inflicted by correctional staff. Closer scrutiny is cause for further concern. The total number of substantiated incidents of sexual abuse by CCC's workforce, the majority of which are its 300 officers, ranged between 75 and 105 annually, indicative of an appreciable percentage of offending within the custodial workforce.

| MO Department of Corrections *Substantiated* Staff-on-Inmate Sexual Abuse | | | | | |
|---|---|---|---|---|---|
| Incident Type by Year: | 2015 | 2016 | 2017 | 2018 | Total |
| **Inmate-on-Inmate, all substantiated complaints** | **49 (65%)** | **50 (60%)** | **68 (65%)** | **65 (71%)** | **232 (65%)** |
| **Staff-on-Inmate, all substantiated complaints** | **26 (35%)** | **33 (40%)** | **37 (35%)** | **27 (29%)** | **123 (35%)** |
| Staff Sexual Misconduct, all substantiated | *13 (17%)* | *20 (24%)* | *28 (26.5%)* | 19 (20%) | *80 (23%)* |
| Staff Sexual Harassment, all substantiated | 13 (17%) | 13 (16%) | 9 ( 8.5%) | 8 ( 9%) | 43 (12%) |
| **Total Substantiated Staff-on-Inmate Sexual Abuse** | *75* | *83* | *105* | 92 | *355 (100%)* |

2015 MDOC PREA Annual Report at https://doc.mo.gov/sites/doc/files/2018-01/2015_PREA_Data.pdf, 2016 MDOC PREA Annual Report at https://doc.mo.gov/sites/doc/files/2018-01/2016_PREA_Data.pdf, 2017 MDOC PREA Annual Report at https://doc.mo.gov/sites/doc/files/media/pdf/2019/02/2017_PREA_Data.pdf, and 2018 MDOC PREA Annual Report at https://doc.mo.gov/media/pdf/2018-annual-report.

D.  It is my opinion, Defendants failed to meet the duty of care as enumerated in the Prison Rape Elimination Act and Department Procedure Manual, Policy D1-8.13, Offender Sexual Abuse and Harassment, and owed Ms. Dean and other offenders who were victims of sexual abuse during their incarceration. I declare under penalty of perjury that the foregoing is true and correct.

*Jara B. Serrio*

February 21, 2020